887 P.2d 1269

**STATE of New Mexico,
Plaintiff–Appellant,**

v.

**Tony ARMIJO, Defendant–Appellee.**

No. 15172.

Court of Appeals of New Mexico.

Oct. 20, 1994.

Certiorari Denied Dec. 7, 1994.

**804**

Tom Udall, Atty. Gen., Richard J. Klein, Asst. Atty. Gen., Daniel J. Pearlman, Asst. Atty. Gen., Santa Fe, for plaintiff-appellant.

Anthony James Ayala, Anthony James Ayala, P.A., Albuquerque, for defendant-appellee.

*OPINION*

HARTZ, Judge.

On September 29, 1992, the Santa Fe County Grand Jury indicted Tony Armijo (Defendant) on eight counts relating to his conduct while executive director of the New Mexico Public School Insurance Authority (the Insurance Authority) and the New Mexico Retiree Health Care Authority (the Retiree Authority). Also indicted on one count of fraud and one count of bribing Defendant were Glen Slaughter & Associates (Slaughter), which had contracts with both the In-

surance Authority and the Retiree Authority, and Allen Pufahl, a Slaughter employee. The district court ordered that Defendant be tried separately from Slaughter and Pufahl, who were tried first. A jury in April 1993 convicted Slaughter on both counts and acquitted Pufahl.

On August 20, 1993, Defendant filed a motion to dismiss the indictment and disqualify the attorney general's office, claiming that (1) perjured testimony was used to obtain the indictment, (2) exculpatory evidence was not presented to the grand jury, and (3) the prosecutors engaged in outrageous misconduct. After conducting an evidentiary hearing on September 15, 20, 22, and 28, 1993, the district court on October 15 entered an order quashing the indictment and disqualifying the office of the New Mexico Attorney General from prosecuting "the current cause of action."

The State appeals from both the quashing of the indictment and the disqualification. We reverse.

## I. PROCEDURAL OBJECTIONS TO THE APPEAL

Before turning to the merits, we address Defendant's procedural objections to the State's appeal. Defendant has moved to dismiss the appeal because the orders challenged by the State are not final, appealable orders. He also contends that the State is precluded from challenging the sufficiency of the evidence to support the district court's ruling because the State failed to request findings of fact and conclusions of law.

We first address this Court's appellate jurisdiction. NMSA 1978, Section 39–3–3(B) (Repl.Pamp.1991), states:

B. ... In any criminal proceeding in district court an appeal may be taken by the state to the supreme court or court of appeals, as appellate jurisdiction may be vested by law in these courts:

(1) within thirty days from a decision, judgment or order dismissing a complaint, indictment or information as to any one or more counts;

(2) within ten days from a decision or order of a district court suppressing or

excluding evidence or requiring the return of seized property, if the district attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

On its face this statutory provision authorizes the State's appeal from the district court's dismissal of the indictment against Defendant. Defendant argues, however, that the dismissal is not appealable because it was without prejudice (the order authorized the Santa Fe County District Attorney to pursue the matter with a grand jury) and therefore was not a final order. He relies on civil cases which have held that, at least in some circumstances, a dismissal without prejudice is not a final, appealable order. *See, e.g., Montoya v. Anaconda Mining Co.,* 97 N.M. 1, 3–4, 635 P.2d 1323, 1325–26 (Ct.App.1981).

■ Defendant errs in assuming that Section 39–3–3 incorporates the finality requirements imposed for appeals in civil cases. The section contemplates appeals from orders that would be considered interlocutory in the civil context. For example, Section 39–3–3(B)(1) specifically approves an appeal from the dismissal of one count in a multi-count indictment. In civil cases, in contrast, the dismissal of one out of several claims against a single party is ordinarily not a final judgment. *See* SCRA 1986, 1–054(C)(1) (Repl.1992). Perhaps even more telling is that Section 39–3–3(B)(2) permits the State to appeal orders suppressing evidence, which would virtually always be non-final orders in the civil context. We conclude that the legislature intended to permit the State to appeal any order dismissing one or more counts of a complaint, indictment, or information, regardless of whether the dismissal is with prejudice.

■ Somewhat more complex is the appealability of the portion of the order disqualifying the attorney general. Section 39–3–3(B) does not apply. Nevertheless, we have recognized the State's constitutional right to appeal even in circumstances not encompassed by Section 39–3–3(B). *State v.*

*Santillanes,* 96 N.M. 482, 484–86, 632 P.2d 359, 361–63 (Ct.App.1980), *rev'd on other grounds,* 96 N.M. 477, 632 P.2d 354 (1981), held that the State could appeal a district court order forbidding any sentence enhancement after the defendant had been sentenced on the charges in the indictment. The Court wrote:

> We think the instant matter is governed wholly by the constitutional amendment of 1965 granting an "absolute right to one appeal" to any aggrieved party. Article VI, § 2, N.M. Const. The State is without question a party to every criminal proceeding in the district courts; a claim of disposition contrary to law is a valid and legal grievance which indisputably makes the State "an aggrieved party." In our view, § 39–3–3 merely recognizes the State's constitutional right to appeal, and identifies circumstances permitting ordinary and interlocutory appeals, and affirms the constitutional prohibition against appeals that would violate double jeopardy principles. The legislature, by statute, may not diminish a right expressly provided by the constitution; "no branch of government may add to, nor detract from" the constitution's clear mandate. *State v. Mechem,* 63 N.M. 250, 316 P.2d 1069 (1957).

*Id.* at 486, 632 P.2d at 363. *Santillanes* was approved by our state Supreme Court in *State v. Aguilar,* 95 N.M. 578, 624 P.2d 520 (1981), which permitted an appeal from a district court ruling holding unconstitutional a mandatory imprisonment provision of a firearm enhancement statute. The Court cautioned, however, that "the State does not have an absolute right to appeal in every situation in which it may feel 'aggrieved' by a trial court's ruling." *Id.* at 579, 624 P.2d at 521. It permitted appeal in that case because of the "State's strong interest in the enforcement of its statutes." *Id.*

Pursuant to *Santillanes* and *Aguilar* we hold that the State may appeal the district court's disqualification of the attorney general. The attorney general holds high office granted by the authority of the voters of New Mexico. NMSA 1978, Section 8–5–2 (Repl.Pamp.1994), states:

Except as otherwise provided by law, the attorney general shall:

. . . .

B. prosecute and defend in any other court or tribunal all actions and proceedings, civil or criminal, in which the state may be a party or interested when, in his judgment, the interest of the state requires such action or when requested to do so by the governor[.]

It is a matter of grave importance when a district court disqualifies the attorney general from performing a duty required by law. The State's interest in this appeal is of comparable strength to that in *Aguilar.*

Defendant counters, however, that appeal of the disqualification is foreclosed by our decision in *State v. Pacheco,* 115 N.M. 325, 850 P.2d 1028 (Ct.App.1993), which held that an order disqualifying counsel for a criminal defendant is not a final, appealable order. We relied on an identical ruling by the United States Supreme Court in *Flanagan v. United States,* 465 U.S. 259, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984). *Pacheco* and *Flanagan,* however, are distinguishable on two grounds.

First, because the State cannot appeal an adverse verdict at trial (an acquittal), an order that would not be final if issued against a defendant may as a practical matter be final with respect to the State. If a trial judge erroneously disqualifies defense counsel and the defendant is subsequently convicted, the defendant may successfully appeal the conviction on the ground of denial of the right to counsel. In contrast, if the trial court erroneously disqualifies the prosecutor, and the defendant is then acquitted, the State has no recourse because an appeal would violate the defendant's protection against double jeopardy. *See generally County of Los Alamos v. Tapia,* 109 N.M. 736, 739, 790 P.2d 1017, 1020 (1990) (acquittal mandates dismissal of appeal by state). Similarly, if the substitute prosecutor does not pursue the charges against the defendant, we are aware of no recourse available to the State. *Cf. McKenzie v. Fifth Judicial Dist. Court,* 107 N.M. 778, 765 P.2d 194 (Ct.App.) (grand jury report taking no action is not a final, appealable order), *cert. denied,* 107 N.M. 785, 765 P.2d 758 (1988). For this reason the United States Court of Appeals for the Seventh Circuit distinguished *Flanagan* and permitted the United States to appeal the disqualification of the Attorney General of the United States from participation in a particular grand jury investigation, holding that the disqualification was appealable under the collateral order doctrine. *In re Grand Jury Subpoena,* 873 F.2d 170, 172–73 (7th Cir.1989); *see Commonwealth v. Carsia,* 341 Pa.Super. 232, 491 A.2d 237, 240 (1985) (disqualification of attorney general from prosecution was final, appealable order, even though county district attorney had filed information charging the same offenses based on the same incident), *aff'd,* 512 Pa. 509, 517 A.2d 956 (1986); *see also Digital Equip. Corp. v. Desktop Direct,* ––– U.S. –––, –––, 114 S.Ct. 1992, 1995, 128 L.Ed.2d 842 (1994) ("The collateral order doctrine is best understood not as an exception to the 'final decision' rule ... but as a 'practical construction' of it[.]").

The second feature distinguishing this case from *Pacheco* is that the appeal of the disqualification accompanies the appeal of an order that we have already held to be appealable. While we are reviewing the dismissal of the indictment, we should also consider the disqualification of the attorney general's office, particularly because, as we shall see, the two issues are so closely related. After all, perhaps the principal reason for forbidding appeals of interlocutory orders is to limit piecemeal appeals. *See Hinkle High Ridge v. City of Albuquerque,* ––– N.M. –––, ––– P.2d ––– (Ct.App.1994) [No. 14,606, filed 8–1–94]. It would turn that rationale on its head to deny the appealability of one portion of an order when the appellate court is already hearing an appeal as of right on a closely related portion of the same order. In his special concurrence in *Pacheco,* Judge Donnelly pointed out that a party could seek immediate review of an order disqualifying counsel by applying for an extraordinary writ

or writ of error. *Pacheco,* 115 N.M. at 327, 850 P.2d at 1030 (Donnelly, J., concurring). We would hardly be encouraging efficiency in the appellate courts by requiring the State to pursue two separate paths for review of the district court's order in this case—an appeal to this Court of the dismissal of the indictment and pursuit of a writ in a second proceeding regarding disqualification. *Cf. Wagner v. Wheeler,* 13 F.3d 86, 90–91 n. 2 (4th Cir.1993) ("[W]here an interlocutory appeal is made possible by the denial of a colorable claim of qualified immunity, this court should consider any issue fairly presented by the record which relates to that issue.").

A helpful analogy can be found in the treatment by the federal courts of denials of class certification in civil actions. An order denying class certification is not in itself appealable. *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). Yet, denial of class certification appears to be reviewable as part of an appeal from an appealable order dismissing the entire action. *See, e.g., Montgomery v. Rumsfeld,* 572 F.2d 250 (9th Cir.1978) (dismissal of complaint without prejudice).

In sum, we hold that on appeal from an order dismissing an indictment we may also review a second portion of the order that disqualifies the prosecutor on grounds related to those supporting the dismissal of the indictment.

■ We can deal summarily with Defendant's third procedural issue. He contends that the State cannot challenge the sufficiency of the evidence to support the district court's ruling because the State did not submit proposed findings of fact and conclusions of law to the district court. This argument is improperly based on rules relating to civil cases. *See* SCRA 1986, 1–052(B) (Repl. 1992); *Cockrell v. Cockrell,* 117 N.M. 321, 871 P.2d 977 (1994). The same rules do not apply to criminal proceedings. Defendant's reliance on *Smith v. Maldonado,* 103 N.M. 570, 711 P.2d 15 (1985), is misplaced. That case was not a criminal appeal. The opinion reviewed a proceeding instituted by a petition for a writ of habeas corpus. In such proceedings the predecessor to present Rule 1–052 applied. *See Smith,* 103 N.M. at 572, 711 P.2d at 17. We therefore now address the merits.

## II. MERITS

### A. Dismissal of the Indictment

#### 1. Background

Although one of the eight counts in the indictment against Defendant involves his conduct as executive director of the Retiree Authority as well as his conduct as executive director of the Insurance Authority, the issues raised on this appeal relate only to the Insurance Authority. The purpose of the Insurance Authority is to "provide comprehensive core insurance programs for all participating public schools, school board members, school board retirees and public school employees and retirees." NMSA 1978, § 22–2–6.2. (Repl.Pamp.1993). The Authority administers the public school insurance fund, which is used primarily for procuring insurance and insurance-related services. NMSA 1978, § 22–2–6.6(A), (F) (Repl.Pamp.1993). Money for the fund comes from school districts and other participating entities. NMSA 1978, § 22–2–6.10 (Repl.Pamp.1993). School districts must participate unless granted a waiver by the Authority. NMSA 1978, § 22–2–6.9 (Repl.Pamp.1993). The Authority has the power to enter into professional service and consulting contracts and procure lines of insurance coverage by competitive bid in accordance with the state procurement code. NMSA 1978, § 22–2–6.7(B), (G) (Supp.1994).

The Authority is governed by a Board of Directors (the Board) composed of nine members selected by various education associations, such as the state board of education, the state school administrators, the national education association, and the federation of teachers. NMSA 1978, § 22–2–6.5 (Repl. Pamp.1993). Board members receive per diem and mileage but no other compensation. Section 22–2–6.5(D). Day-to-day operations

of the Authority are the responsibility of a salaried executive director. Defendant was hired by the Board to serve as executive director. Slaughter had a contract with the Authority to act as third-party administrator of the Authority's insurance program.

The indictment against Defendant contained eight counts. Count I charged him with demanding or receiving a bribe. It alleged that while serving as executive director of the Insurance Authority and the Retiree Authority, Defendant accepted a $3395.49 birthday party reception with the intent to have his official conduct influenced on three matters to be brought before him. All related to Slaughter, which had contracts with both the Insurance Authority and the Retiree Authority. The matters were:

> (1) [Insurance Authority] approval of past monies paid to [Slaughter] by [the Insurance Authority] in excess of its contract limits; ... (2) future increases in monies to be paid to [Slaughter] under a renegotiated contract with [the Insurance Authority]; ... (3) future increases in monies to be paid to [Slaughter] under a renegotiated contract with [the Retiree Authority.]

Count II charged Defendant with defrauding the Board of the Insurance Authority "into approving (1) more than $20,000.00 in past monies paid to [Slaughter] by [the Insurance Authority] in excess of its contract limits, and/or (2) future increases of more than $20,000.00 in monies to be paid to [Slaughter] under a renegotiated contract with [the Insurance Authority]."

Counts III through VII charged Defendant with fraud, attempted fraud, and making false public vouchers. These charges relate to alleged misuse of official credit cards. Count VIII charges racketeering predicated on the misconduct alleged in other counts.

The October 15, 1993, order dismissing the indictment does not state the grounds for the dismissal. But the district court's oral decision, expressed immediately after argument on September 28, 1993, indicates that the court based its ruling on its view that (1) Board President Larry Binkley and the Board's contract attorney, Frank R. Coppler, gave incorrect testimony to the grand jury concerning a June 7, 1991, Board meeting, (2) a tape recording of the meeting demonstrated the errors, and (3) the attorney general's office had the tape but intentionally or negligently failed to present it to the grand jury.[1] A proper understanding of the matters before us requires a summary of the meeting and its context. After we review what actually happened at the June 1991 meeting, we can determine whether there were errors in the grand jury testimony by Binkley and Coppler.

The Authority entered into a contract with Slaughter effective October 1, 1989. The contract provided for a transition period from October 1, 1989, to December 31, 1989, during which Slaughter would begin to assume the duties of the prior contractor. The transitional services related primarily to handling open enrollment and developing and implementing an accounting system. As of January 1, 1990, Slaughter would assume all duties. These duties included (1) serving as administrative manager of the employee benefits fund; (2) providing accounting services; and (3) handling billing services. After January 1, 1990, the contract limited compensation to Slaughter to payment of $.50 per employee per month enrolled in the dental plan and $2.20 per employee per month enrolled in the medical plan, up to an annual maximum of $548,400. The president of the Authority executed the agreement on behalf of the Authority.

---

1. The pertinent remarks of the district court were as follows:

> This case deserves a fresh look from someone whose judgment is not jaded by allegations of prosecutorial misconduct. It is clear to me that Mr. Binkley and Frank Coppler's testimony is incorrect when compared with the actual transcript of what occurred during the meeting. The Attorney General's Office had the tape and either intentionally or negligently failed to present it to the grand jury.... An indictment tainted with allegations of prosecutorial misconduct cannot stand. The defendant had the constitutional right and has demonstrated that exculpatory evidence was not presented to the grand jury.

On October 6, 1989, Defendant, in his capacity as executive director of the Authority, wrote Slaughter a letter to serve as an addendum to the agreement. The operative provisions of the letter stated:

The contractor is hereby authorized to incur actual pass-through costs on behalf of the [Insurance Authority] up to the maximum amount as pre-approved by the Executive Director of the Authority for reimbursement to the contractor for actual open enrollment expenses of:

1. Copying costs

2. Shipping of materials

3. Postage

4. Advertising

5. Printing

for the period October 1, 1989, through December 30, 1989.

The letter concluded: "This addendum shall be presented for Authority Board approval on the 28th day of October, 1989." At its meeting on October 25, 1989, the Board approved the October 6 "rider" at the recommendation of Defendant, although there may be some question as to whether the terms of the letter (which at the meeting was distributed to Board members and referred to by Defendant) differ from the terms described to the Board by Defendant at the meeting.

The agreement was modified again in the summer of 1990. On August 14, 1990, a Slaughter officer wrote Defendant to request a 10% fee increase to cover increased operating costs. Because the increase would not be retroactive to July and August, the letter said that the "annualized increase" would be 8.3%. The Board approved the request at its meeting on August 28, 1990. Beginning in October 1990, Slaughter charged $2.42 per enrollee per month in health plans (up from $2.20) and $.55 per enrollee per month in dental plans (up from $.50).

At its June 17, 1991, meeting the Board addressed two matters regarding its contractual relationship with Slaughter. These two matters are the first two of the three matters listed in Count I of the indictment as having been the objects of the alleged bribe of Defendant. The first was Item 5B1 of twenty-one items on the agenda during the two-hour meeting. The item was added to the agenda at the beginning of the meeting at the request of Defendant. Defendant stated, "[A]ll I need is for the record to be amended to correctly reflect what actually occurred [at the Board meeting of October 25, 1989]." The amendment to the minutes would reflect Board action at the 1989 meeting to "take out the annual cap and to allow for extra costs like copying, postage and advertising and printing to be paid," and thereby would establish that the Authority had been paying Slaughter correctly during the prior eighteen months. On May 16, 1991, attorney Coppler had written the deputy director of the Authority—with copies indicated to Defendant, Board president Binkley, and all other Board members—that the Authority could not properly increase the maximum amount negotiated in the contract because an upward revision was "not provided for in the contract and was prohibited by the [request for proposals which Slaughter had bid on]." A follow-up letter on May 21, copied to the same persons, reiterated Coppler's view that the original contract set both a per-participant cap and a total annual dollar cap. At the June 17 Board meeting, when Coppler was asked whether the matter had been brought to his attention and whether he had any advice, he responded that he had not looked at whether the minutes needed to be amended. The Board voted unanimously to amend the minutes.

The second item was renewal of the Slaughter contract for the period beginning July 1, 1991. Defendant introduced the matter to the Board as follows:

[Defendant]: [T]he whole issue has been this cap issue and I would like Mr. Coppler, who has been in the negotiations with [Slaughter], and I think they've come up with a solution where you can have a cap, but also with that goes a rider that once you're approaching that cap that both parties by mutual agreement can increase that

amount and of course the increase will be predicated on increased enrollment. If there's no increase in enrollment there's no need for that. But Frank, I think you had two options for the board to consider as I understand it. My notes here indicate $695,000 with the cost of postage and printing will be paid as they have in the past with a separate set aside, or $748–$745,000 cost, if we want it to be inclusive. Is that correct? Do you want to brief the Board on what you're recommending, why you're recommending and which of the two you recommend. I can give [sic] live with either one.

Coppler: Mr. Chairman, if you will notice in the material following the suggested amendment following that letter. Maybe I ought to move down here, so, some of the people on the other end may not be able to hear me.

. . . .

[Defendant]: Frank, if you could, if members of the Board will turn to the second page of the June 12 letter, where you're looking at B, scratch out, in B, $979,440 and put on the side 695 plus cost of postage and printing. And the second note you want to put is 745, printing and postage inclusive.

Binkley: Repeat that please.

[Defendant]: 6–9–5, $695,000 and the Authority pays the cost of postage and printing. $745,000, the printing and postage to be paid by [Slaughter].

Defendant stated that Slaughter had originally requested a contract for $979,000 but "we got them down to these two amounts." Defendant explained that the increase in cost resulted because "we have increased in enrollment something 3–4,000 people over the last two years." When Binkley expressed concern that Slaughter was cutting staff and that the Authority might not get the same service, Defendant stated that Slaughter's cutbacks were with respect to Retiree Authority staff (not Insurance Authority staff) and that the person laid off in Santa Fe was not assigned to the Insurance Authority's account but was doing strictly Retiree Authority work. Binkley disagreed, saying that the person released had gone to the school districts on matters other than retiree health care. Representatives of Slaughter at the meeting acknowledged that Slaughter had eliminated one person who serviced the schools but did not expect service to suffer.

Coppler then summarized the meaning of the letter agreement in a little more than one hundred words. Binkley asked for a motion prior to discussion. When one member started to make the motion and then asked for help, Coppler offered appropriate language. The substantive discussion that followed was brief and addressed only a suggestion by a Board member that the proposal be to cap postage and printing at $50,000 and cap the remainder of contract expenses at $695,000. The suggestion was adopted and the proposal was approved unanimously. Beginning in July 1991 Slaughter raised the charge per enrollee in health plans from $2.42 per month to $2.80 per month and raised the charge per enrollee in dental plans from $.55 per month to $.66 per month.

We will refer to additional matters in the record as they are necessary to dispose of issues presented on appeal.

## 2. Discussion

Citing *Buzbee v. Donnelly,* 96 N.M. 692, 634 P.2d 1244 (1981), and *State v. Hewitt,* 108 N.M. 179, 184, 769 P.2d 92, 97 (Ct.App.), *cert. quashed,* 107 N.M. 785, 765 P.2d 758 (1988), Defendant contends that an indictment should be dismissed if the prosecution withholds directly exculpatory testimony or infringes upon the independent judgment of the grand jury through misconduct such as perjury, deceit, or malicious overreaching. Before addressing the specifics of Defendant's claims, we make some preliminary observations.

First, it is important to note that the basis for the *Buzbee* decision was not the constitution, but a statute. In addressing

the defendants' claims that their indictments should be dismissed because of the prosecution's failure to present allegedly exculpatory evidence to the grand jury, the Court rejected an argument based on constitutional due process. After reviewing federal case law and observing that the United States Supreme Court had not imposed due process restrictions on the presentation of evidence to a grand jury, the Court wrote, "We do not perceive a due process question." *Buzbee,* 96 N.M. at 706, 634 P.2d at 1258. (The United States Supreme Court has recently reaffirmed its earlier decisions in this area. *See United States v. Williams,* 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992).) The basis for the rule of *Buzbee*—that an indictment may be dismissed if the prosecutor withholds directly exculpatory evidence—is NMSA 1978, Section 31–6–11(B), which states: "The prosecuting attorney assisting the grand jury shall present evidence that directly negates the guilt of the target where he is aware of such evidence." *See Buzbee,* 96 N.M. at 698, 634 P.2d at 1250. The statutory language makes clear that the rule of *Buzbee* is not violated simply because the prosecutor fails to produce evidence that is exculpatory. The prosecutor must know of the existence of the evidence and that it is exculpatory. In particular, *Buzbee* does not apply when a prosecutor, through negligence, fails to pursue an investigative lead that would produce directly exculpatory evidence. *Cf. State v. Ware,* 118 N.M. 319, 881 P.2d 679 (1994) (trial court erred in suppressing photographs and testimony regarding rock alleged to be weapon used in battery; even though rock was material evidence, police officers were merely negligent in their failure to collect rock).

Second, when *Buzbee* discussed the possibility that an indictment may be dismissed because of perjured testimony, *Buzbee,* 96 N.M. at 697, 634 P.2d at 1249; *id.* at 703–04, 634 P.2d at 1255–56 ("obtaining an indictment on basis of evidence known to be perjurous [sic]" is a "fundamentally unfair" tactic), the Court emphasized several restrictions on the use of that ground as a basis for dismiss-

al. In particular, it warned against allowing mini-trials on every indictment. *See id.* at 697, 634 P.2d at 1249. Ordinarily, it is for the fact finder at trial, not the court in a pretrial hearing, to determine whether a witness has lied. *Cf. Bustillos v. Construction Contracting,* 116 N.M. 673, 676, 678, 866 P.2d 401, 404, 406 (Ct.App.1993) (discovery rules in civil cases do not permit dismissal of claim solely because of perjury in discovery proceedings regarding material issues in the case; such a dismissal would improperly preempt the trial).

 Third, we reject Defendant's contention that we review the district court's dismissal only to determine whether there was an abuse of discretion. *Buzbee* and its progeny do not apply that standard of review. We will, of course, defer to the district court in its role as a finder of facts; and once misconduct warranting sanctions has been established, we may defer to the district court's discretion regarding what sanction is appropriate. *See State v. Riggs,* 114 N.M. 358, 361, 838 P.2d 975, 978 (1992). Yet, following the approach of *Buzbee* and *Hewitt,* we treat as a matter of law, reviewed de novo on appeal, whether the record supports a finding of conduct by the prosecution that so violated required legal norms as to justify sanctions.

 We now turn to the specifics of this case. We begin with the grounds upon which the district court apparently relied for dismissal. Other than the oral statement quoted earlier in this opinion, the district court did not express the grounds for its decision. Nevertheless, the questions and comments by the district court during the hearing, together with the court's statement at the conclusion of the hearing, clearly indicate that the court's central concern was the failure of the prosecution to present to the grand jury a tape recording or transcript of the Board meeting of June 17, 1991. The district court apparently believed that the transcript proved that the grand jury testimony of Binkley and Coppler were wrong in very material respects and that the grand

jury could not have known of those errors without listening to the tapes of the pertinent portions of the meeting or reading a transcript. The district court erred in two respects: (1) Dismissal is proper only for *knowingly* withholding exculpatory material; yet there was no evidence (nor any finding by the district court) that the prosecution's failure to provide the grand jury with tapes or a transcript resulted from an intentional effort to withhold exculpatory material, or even a bad faith refusal to conduct an investigation that might uncover exculpatory material. (2) The transcript does not contain any directly exculpatory evidence that was not presented to the grand jury by other means.

With respect to the first source of error, there was no evidence (other than Defendant's bald assertion) that anyone in the attorney general's office had listened to a tape recording of the June 1991 Board meeting or read a transcript of the tape recording prior to the indictment. At the district court hearing on the motion to dismiss, the prosecutor explained that his office did not have the unusual equipment required to listen to the tapes. There is also no evidence that the State acted in bad faith in delaying the acquisition of such equipment. Because, as noted above, *Buzbee* authorizes dismissal only when the State knows that it is withholding exculpatory evidence, it was improper to quash the indictment on the ground that the State failed to provide the grand jury with the tapes or a transcript. *See State v. Doran,* 105 N.M. 300, 302, 731 P.2d 1344, 1346 (Ct. App.1986) (although grand jury testimony was false, there was no showing that prosecutor knew it was false), *cert. denied,* 105 N.M. 290, 731 P.2d 1334 (1987).

As for the exculpatory nature of the transcript of the June 1991 Board meeting, we have carefully reviewed the evidence and do not find in the transcript any directly exculpatory material that was not otherwise presented to the grand jury. To be "directly exculpatory" under *Buzbee,* the omitted evidence must be admissible evidence "directly negating the guilt of defendant, as opposed to evidence which indirectly negates defen-

dant's guilt." *Hewitt,* 108 N.M. at 182, 769 P.2d at 95; *see Buzbee,* 96 N.M. at 699, 634 P.2d at 1251. "Direct evidence is evidence that, if believed, proves the existence of facts without inference or presumption." *State v. Lara,* 110 N.M. 507, 516, 797 P.2d 296, 305 (Ct.App.), *cert. denied,* 110 N.M. 330, 795 P.2d 1022 (1990); *see State v. Juarez,* 109 N.M. 764, 766–68, 790 P.2d 1045, 1047–49 (Ct.App.), *cert. denied,* 109 N.M. 751, 790 P.2d 1032 (1990).

The district court was troubled by grand jury testimony by Binkley that Defendant had recommended the actions on the Slaughter contracts taken by the Board at the meeting. The district court focused on the absence of any form of the word *recommend* in the transcript. In our view, however, that absence is not dispositive. Regarding the Board's action in amending its October 1989 minutes to permit Slaughter to charge extra for copying, postage, advertising, and printing, Defendant had proposed at the outset of the June 1991 meeting that the item be added to the agenda, and then in explaining the item he said, *"[A]ll I need is* for the record to be amended to correctly reflect what actually occurred. . . ." To say that Defendant "recommended" action is a reasonable paraphrase of the Defendant's stating that he "needed" certain action. In fact, at the motion hearing Defendant testified, "I recommended to the Board that they amend their minutes of October of 89." There is nothing "directly exculpatory" about the meeting transcript in this respect.

Also consistent with a reasonable interpretation of the meeting transcript is Binkley's testimony that Defendant recommended the renewal of the Slaughter contract to commence on July 1, 1991. Defendant described the two alternatives (a cap of $695,000 with costs of postage and printing handled separately, or an overall cap of $745,000) and then said to attorney Coppler: "Do you want to brief the Board on what you're recommending, why you're recommending and which of the two you recommend. I can give [sic] live with either one." The district court apparently thought that the only possible construc-

tion of Defendant's statement is that any recommendation regarding the contract would come from Coppler. Coppler, however, said nothing regarding the merits of the contract. He did no more than give a brief summary of the difference between the two alternatives. It would have been reasonable for Binkley to interpret Defendant's remarks as constituting a recommendation that one of the two alternatives be adopted and that the Board defer to the lawyer regarding which form was preferable. Supporting this interpretation of Defendant's remark is Defendant's later explanation for the increase in the contract—an increase in enrollment rather than a cost-of-living adjustment. No one at the meeting but Defendant gave any reason for the increase.

One must also keep in mind the context. An unsalaried Board was deciding a number of matters in a two-hour meeting. The head of the full-time staff could ordinarily be expected to prepare a presentation to the Board and have a recommendation. On neither of the two matters involving Slaughter was there more than very brief discussion of the merits by the Board members. Thus, regardless of the language used by Defendant, the context could well imply that proposals presented to the Board by Defendant were "recommended" by Defendant. Binkley testified before the grand jury that contract awards to insurance companies, third-party administrators, and benefit consultants "were brought before the Board and were—I would say approved by the Board under the recommendation of the staff." He further testified that normally a majority of the Board supported staff recommendations, and he recalled no Board rejection of a staff recommendation on a contract prior to January 1992. Perhaps the verbatim transcript of the June meeting would raise doubts in some minds regarding whether Defendant in effect was recommending the two actions with respect to Slaughter; but at most the transcript could be the source of two contrary inferences, one supportive of Binkley's grand jury testimony and one not. Failure to provide such evidence to the grand jury

does not satisfy the *Buzbee* test. *See State v. Penner,* 100 N.M. 377, 379, 671 P.2d 38, 40 (Ct.App.1983) (defendant must show that the evidence omitted would have changed the grand jury's determination of probable cause).

A second concern of the district court was Binkley's grand jury testimony that he did not recall any communications from attorney Coppler regarding the Slaughter contract prior to the June meeting of the Board. The district court noted that Coppler had written two lengthy letters on the subject which indicated on their face that they were copied to Binkley. Nevertheless, there was no failure of disclosure to the grand jury. The two letters were both grand jury exhibits. Immediately after Binkley testified that he did not recall any communications from Coppler, the prosecutor showed Binkley the two letters and asked if they refreshed his recollection. Binkley stated that he did not recall receiving them and agreed that it was possible that he had received them but not read them.

The district court also voiced doubts about Coppler's testimony. The court apparently believed that Coppler falsely told the grand jury that he was not asked his opinion at the June 1991 meeting regarding the correction of the October 1989 minutes to permit Slaughter to charge for the cost of printing, etc. The grand jury transcript, however, reveals the following exchange:

> [PROSECUTOR]: Did anyone ask for your opinion [with respect to the matter covered by Coppler's two May 1991 letters] at the meeting? Did they ask if you had anything to say?
>
> [COPPLER]: I think they did, because in the minutes I'm quoted as talking about the letter agreement that [Defendant] was recommending, so I'm sure I was asked about his recommendation, the letter agreement he was recommending. I don't know that I was asked about my earlier letters that we've been talking about, no.

Coppler's testimony was not contradicted by the transcript of the Board meeting. More-

over, to the extent that the transcript of the Board meeting reflects that Coppler was asked about the subject, the Board minutes, which were a grand jury exhibit, reflect the same. Thus, there was no failure to disclose.

Finally, the district court expressed concern that the failure of the prosecution to provide the grand jury with a transcript of the June 1991 Board meeting prevented the grand jury from learning of the legitimate reason why the contract amount was to be increased beginning in June 1991. According to the meeting transcript, Defendant stated:

> [N]ot to mislead anybody, to think that they've increased in cost this dramatically, we have increased in enrollment something 3–4,000 people over the last two years and that's really the increase in cost, not a cost of living adjustment. Okay? It's been more an increase in participation rather than—that's an apples to apples type of increase.

The State contends that this comment by Defendant is inculpatory, rather than exculpatory, because it was false and misled the Board. According to the State, enrollment had decreased since the August 1990 increase in the Slaughter contract. In any event, the district court was incorrect in thinking that the quoted explanation was withheld from the grand jury. The minutes of the Board meeting, which were a grand jury exhibit, state: "[Defendant] explained that the earlier amount has increased because [the Insurance Authority] has increased the enrollment 3–4,000 people over the last two years, therefore, this is not a cost of living adjustment."

Thus, we find no merit to the grounds for dismissal expressed by the district court. Our review, however, is not restricted to those grounds. Perhaps the district court had additional reasons for dismissing the indictment. Moreover, as Defendant argues on appeal, this Court could affirm on a ground not relied upon by the district court or could remand for further proceedings before the district court to determine how the district court would rule on alternative grounds. We have therefore reviewed the multitudinous grounds raised in Defendant's brief.[2] We have considered all the contentions that we can extract from Defendant's brief and find them without merit.

Defendant contends that the attorney general withheld from the grand jury exculpatory evidence regarding misconduct by directors of the Insurance Authority and its attorney. One claim is that Board president Binkley "had improperly assisted the company with whom he was associated ... in bidding on contracts with the authority in question, at the same time he was sitting on the board of directors of the authority." The factual basis of this contention is incorrect. The company referred to did not bid on any contract with the Insurance Authority during Binkley's relationship with the company. The other alleged misconduct was misuse of credit cards. The evidence of such misuse is, however, quite tenuous. For example, there is no evidence of double payment (paying per diem and also reimbursing for credit card expenditures). Some allegations of abuse were rebutted by explanations showing the propriety of the payment, and other allegations were not supported by any evidence in the prosecutor's possession prior to the indictment. In any event, even clear evidence of false vouchering or like misconduct by persons other than Defendant would not directly exculpate Defendant. That other persons violated the law could hardly establish that Defendant did not do so. To the extent

---

**2.** Defendant's answer brief is 82 pages long, more than twice as long as permitted by the rules of appellate procedure. SCRA 1986, 12–213(F). This Court did not approve Defendant's submission of a brief in excess of the rule's page limits. Indeed, the Court file reflects no motion to permit an excessively long brief. A certification of service in the file, however, indicates that defense counsel did prepare such a motion and send it to opposing counsel. We caution counsel to comply in the future with our rules of appellate procedure. Sanctions may be appropriate for any future violation. More importantly, in our experience briefs that exceed the page limits, even when this Court has approved the additional pages, are almost invariably unpersuasive. A winning argument can fit within the limitations of the rule.

that Defendant could prove that he knew of such misconduct prior to his engaging in the acts for which he was charged, Defendant might be able to use the acts of others to argue that he thought his own conduct was permissible. Yet, such evidence would still not meet the "directly exculpatory" standard of *Buzbee.*

Defendant makes a related claim that various grand jury witnesses had falsely described the practices and policies of the Insurance Authority with respect to per diem and credit-card use. He so testified at the motions hearing. But because Defendant did not agree to testify before the grand jury, that evidence was not available to the grand jury. Even if his testimony would be directly exculpatory, Defendant made no showing that at the time of the indictment the attorney general's office knew of any exculpatory evidence regarding such Authority practices and policies that had not been presented to the grand jury.

Along the same lines, Defendant contends that the grand jury was interested in misconduct by persons other than those indicted and that the prosecutors abused their position by misleading the grand jury about such misconduct. The record belies this contention. *After* the grand jury had voted to indict Defendant, the prosecutors returned to the grand jury to learn of its vote. A grand juror at that time expressed the view that charges should also be brought against the Board for failing to supervise Defendant properly. Prosecutor Daniel J. Pearlman explained that (1) no one could be indicted who had not received a grand jury target notice, (2) grand juries cannot properly issue reports criticizing public agencies, (3) failure of a board to perform well is not in itself a crime, and (4) if further evidence of criminal misconduct were uncovered, the prosecution could bring the matter before another grand jury. After that explanation, a second prosecutor, Fred Smith, said: "May I just add that we have received an indication that there is a petition circulating at this time with the purpose, we're told, we haven't seen it but we're told, is to convene another grand jury looking into these matters. Maybe that will (inaudible)." The prosecutors' statements could not have affected the grand jury's earlier vote to indict Defendant and therefore could not justify dismissal of the indictment. *See State v. Crews,* 110 N.M. 723, 738, 799 P.2d 592, 607 (Ct.App.) (dismissal for prosecutorial misconduct must be based on showing of substantial, demonstrable prejudice), *cert. denied,* 109 N.M. 232, 784 P.2d 419 (1989); *Doran,* 105 N.M. at 302, 731 P.2d at 1346 (must show actual prejudice). Moreover, Pearlman's comments were well within the bounds of propriety. As for prosecutor Smith's remarks, they apparently concerned a petition signed by supporters of Defendant seeking a grand jury investigation relating to the Insurance Authority. We will discuss the petition further when addressing the order disqualifying the attorney general's office. Suffice it to say at this juncture that there is no evidence that Smith said anything intentionally misleading.

A further contention of Defendant is that the prosecutors failed to tell the grand jury that it was not Slaughter, but other contract providers for the Authority, who had paid for the birthday party for Defendant that constituted the alleged bribe of Defendant. In fact, however, the grand jury received such evidence, including documents showing the manner in which the payment was made. In particular, although Defendant refused to testify before the grand jury, the grand jury received a transcript of a lengthy interview of Defendant in which he set forth his version of how the party came about and how the money was raised.

Finally, Defendant claims that the prosecution failed to present to the grand jury evidence that persons other than Defendant were the ones who negotiated the 1991–92 contract with Slaughter. He fails, however, to point to any false, or even misleading, testimony before the grand jury regarding Defendant's personal involvement in renegotiating the contract with Slaughter. Furthermore, given Defendant's supervisory role as head of the Authority staff, any evidence that he did not personally engage in the

negotiations would not be directly exculpatory. In this regard, it is significant that the individual who conducted the contract negotiations between Slaughter and the Retiree Authority, also served by Defendant as executive director, testified before the grand jury that he received instructions from Defendant with respect to the percentage increase to grant in the contract.

In sum, we have scoured Defendant's lengthy and discursive brief in an attempt to discern all grounds upon which he claims the indictment should be dismissed. Having examined those contentions in light of the record before us, we find no admissible evidence that the prosecutors knowingly (or even negligently) withheld directly exculpatory evidence or otherwise engaged in improper behavior that would justify dismissal of the indictment. We therefore reverse the district court's order dismissing the indictment.

### B. Disqualification of the Attorney General

■ The attorney general is the State's highest ranking law enforcement officer, elected by the people of New Mexico. *See EPA v. Pollution Control Bd.,* 69 Ill.2d 394, 14 Ill.Dec. 245, 372 N.E.2d 50 (1977). For a court to forbid the attorney general from engaging in a prosecution within the jurisdiction of the office is a serious encroachment on the executive branch. We will not refrain from upholding or ordering the disqualification of a prosecutor in appropriate circumstances, *see, e.g., State v. Pennington,* 115 N.M. 372, 851 P.2d 494 (Ct.App.), *cert. denied,* 115 N.M. 409, 852 P.2d 682 (1993), but disqualification is an action that should be undertaken with the greatest circumspection.

■ To the extent that the district court disqualified the attorney general for the same conduct underlying its dismissal of the indictment, the disqualification was improper. We have reversed the district court's determination that the indictment should be dismissed. The matters raised by Defendant perhaps show less-than-perfect preparation and presentation by the attorney general's office, but that is hardly beneath the standard of care for prosecutors, much less a ground for disqualification.

The district court may, however, have relied on additional grounds for disqualifying the attorney general's office. We therefore examine the grounds raised in Defendant's answer brief on appeal.

■ One ground is that the attorney general's office was itself being investigated by a grand jury with respect to its handling of its investigation and prosecution of this very matter. Nevertheless, there was no evidence before the district court that the grand jury had uncovered any impropriety by the attorney general's office. The grand jury was convened as the result of a citizens' petition. *See* N.M. Const. art. II, § 14 (grand jury to be convened on petition of 200 registered voters in county). The petition sought an investigation of illegal conduct by individuals "associated with or employed" by the Insurance Authority and also sought an investigation of the attorney general, governor, and state treasurer. Although we recognize the importance of appearances in the criminal justice system, the opportunity for perversion of that system renders it contrary to public policy for the mere convening of a grand jury to require that a public official who is a subject of the grand jury investigation be disqualified from performing his or her duties.

■ Defendant also contends that the attorney general's office should be disqualified because of its bias against Defendant. He points to several alleged indications of bias. First, at the motions hearing he testified that assistant attorney general Fred Smith had told persons that he was "out to get" Defendant. But Defendant did not identify the person who reported the statement by Smith, and Smith, who had left the attorney general's office by the time of the hearing, testified that he could not imagine having made such a statement.

■ Second, Defendant testified that Slaughter's attorney, John Wentworth, told

him that the attorney general's office had cut deals with Insurance Authority Board members in an attempt to get Defendant. Wentworth, however, testified that he had not made such a statement to Defendant. There was no other evidence of any deals, and no evidence that any "deals" that may have been struck were improper.

■ Third, Defendant testified that for some time prior to the grand jury proceedings the Insurance Authority and the Retiree Authority had experienced an extremely adversarial relationship with the attorney general's office. But an adversarial relationship is not disqualifying. We see no reason why the attorney general cannot challenge the activities of a state agency by pursuing a course of graduated aggressiveness—starting with informal discussions and proceeding to civil and even criminal sanctions. The issue is not whether the attorney general and the agencies are in an adversarial relationship, but whether the attorney general has acted improperly in that relationship.

■ Defendant's only suggestion of improper conduct arising from the relationship between the Insurance Authority and the attorney general's office is that the latter had approved the very contract which is the subject of the indictment of Defendant. We see no conflict of interest. The review of the contract by the attorney general's office was for legal sufficiency, not financial propriety. The review and approval in no way affirmed the lawfulness of Defendant's conduct with respect to the amount of the contract. The attorneys involved in the review were in a different division of the attorney general's office from those prosecuting the case, and there was no evidence of any confidential communications between Defendant and the attorney general's office. In addition, if there had been confidential communications, any claim of privilege would have to come from the client—the Insurance Authority— not Defendant. *See* SCRA 1986, 11–503(C) (Repl.1994).

■ Another ground for disqualification raised by Defendant is that the attorney general's office allegedly engaged in misconduct with respect to discovery. He claims that the prosecutors gave him nineteen boxes of materials to review while Slaughter received only seven boxes at its trial. Yet, the only specific item of allegedly withheld evidence identified by Defendant is a document acquired by Slaughter from Defendant after Slaughter's trial. There is no evidence that the State had possession of the document and withheld disclosure.

■ In the same vein, Defendant also contends that the prosecutor lied in his closing argument in the Slaughter trial. The allegedly false statement, however, was supported by evidence admitted at that trial. Even if subsequently discovered evidence shows the statement to have been false (a proposition disputed by the State), there is no evidence that the prosecutor knowingly misled the jury.

■ Finally, for completeness we mention two other grounds for disqualification raised in Defendant's answer brief. First, he notes that Fred Smith was the director of prosecution for the attorney general's office at the time of Defendant's indictment, yet Defendant had been "very critical, in a public manner," of Smith in 1981, after Defendant had served as the foreman of a grand jury that Smith had assisted. The record contains no copy of a letter or other communication concerning Smith by Defendant in 1981. A response to Defendant by then attorney general Jeff Bingaman, however, indicates that the criticisms expressed by Defendant were not too derogatory and were viewed by Smith's boss (the attorney general) as at worst the result of an understandable lapse in communication. In light of the remoteness in time of the incident, it could hardly be cause for disqualifying the entire attorney general's office (from which Smith had departed anyway). Second, Defendant contends that the attorney general charged him up front for copying at the rate of $.25 per page, whereas Slaughter's attorney, Wentworth, was billed at only $.06 per page. Assuming that allegation to be true, we do not find it disqualifying.

Thus, the record does not support the order disqualifying the attorney general's office.

## CONCLUSION

We reverse the district court's order dismissing the indictment and disqualifying the attorney general's office. We remand for trial on the indictment.

**IT IS SO ORDERED.**

BLACK and FLORES, JJ., concur.