2008-NMSC-044

188 P.3d 1234

**STATE of New Mexico, Plaintiff–Respondent,**

v.

**Charles Isaac McCLAUGHERTY, Defendant–Petitioner.**

No. 30,272.

Supreme Court of New Mexico.

June 27, 2008.

Jones Day, John D. Cline, San Francisco, CA, Freedman Boyd Hollander Goldberg & Ives, P.A., Zachary A. Ives, Albuquerque, NM, for Petitioner.

Gary K. King, Attorney General, Anita Carlson, Assistant Attorney General, Santa Fe, NM, for Respondent.

## OPINION

MAES, Justice.

{1} This is the second time Charles McClaugherty (Defendant) has appealed to this Court. *State v. McClaugherty* (*McClaugherty I*), 2003–NMSC–006, ¶ 1, 133 N.M. 459, 64 P.3d 486. This appeal concerns events predicated on our remand for a new trial from *McClaugherty I*, which Defendant challenged below based on double jeopardy grounds.

{2} In *McClaugherty I*, we reversed Defendant's convictions because the prosecutor, Kenny Montoya (Montoya), put inadmissible hearsay in front of the jury by reciting portions of statements allegedly given to the police by two witnesses who were not called to testify. *Id.* ¶ 35. During Montoya's cross-examination of Defendant, the last witness at trial, Montoya asked Defendant if he would be surprised that the two witnesses told the police that they each heard him claiming credit for shooting at the victim and "bragging" about the shooting. *Id.* ¶¶ 13–14. We held that this conduct prejudiced Defendant to the extent that the only proper remedy was reversal of the convictions and a remand for a new trial. *Id.* ¶ 35.

{3} After remand to the district court, Defendant's new counsel filed a motion to bar retrial pursuant to *State v. Breit*, 1996–NMSC–067, 122 N.M. 655, 930 P.2d 792. The district court heard the matter, agreed with Defendant, and dismissed the indictment with prejudice. The State timely appealed the dismissal to the Court of Appeals but later filed two motions in the district court: one to dismiss the appeal and a second to reopen the hearing on the motion to bar reprosecution to allow the presentation of additional evidence. The State explained that it sought to introduce "the truth" of what happened at trial by calling the prosecutor "to defend himself against the Court findings in the [O]rder of [D]ismissal" and to "explain his actions to the Court." At the hearing on both of the State's motions, defense counsel agreed to the dismissal of the appeal but argued, *inter alia*, that NMSA 1978, Section 39–1–1 (1917), prohibited the district court from reopening the hearing because it requires that a district court act on a post-judgment motion within a certain time frame, and the time to act had expired. The district court first granted the State's unopposed motion to dismiss its appeal and then granted the State's motion to reopen the hearing on the motion to bar reprosecution. After it heard more evidence in a succession of hearings, the district court vacated its earlier dismissal of the indictment with prejudice and ordered a new trial.

{4} Defendant appealed the order for a new trial to the Court of Appeals, asserting (1) that Section 39–1–1 operated to deprive the district court of jurisdiction to hear the State's motion to reopen the hearing on the motion to bar further prosecution because more than thirty days elapsed from its filing to the motion's resolution, and (2) pursuant to New Mexico Constitution Article II, Section 15 and *Breit*, the district court erred in ordering a retrial. *State v. McClaugherty* (*McClaugherty II* ), 2007–NMCA–041, ¶ 2, 141 N.M. 468, 157 P.3d 33. In a split decision, the Court of Appeals affirmed the district court. *Id.* ¶¶ 53–54.

{5} Defendant appealed two issues to this Court: (1) whether the thirty-day period that Section 39–1–1 sets for the district court to decide a motion to reconsider a final judgment expires during the pendency of an appeal, and (2) whether evidence of the prosecutor's "gross" misconduct in cross-examining Defendant bars retrial under the double jeopardy principles of *Breit*. We granted Defendant's petition for certiorari review and affirm the Court of Appeals' conclusion that under the facts of this case, Section 39–1–1 did not limit the district court's jurisdiction to act on the State's motion to reopen the hearing on the defense motion to bar further prosecution. We take this opportunity to clarify the standard by which courts should measure a prosecutor's misconduct to determine whether or not to bar retrial of a defendant. We conclude that double jeopardy principles, as articulated in *Breit* and clarified herein, bar retrial of this Defendant.

## I. HISTORY OF THIS CASE

### A. Facts and Procedure from the Record

{6} The facts of this case are more completely presented in *McClaugherty I*, we present an abridged version here. The indictment arose from a shooting in Albuquerque over an argument wherein Ricky Solisz argued with a girl on the phone. The conversation allegedly concluded with Solisz threatening to slap or kick her. The girl was at a party at Defendant's apartment, and Defendant took umbrage when he was told of Solisz's aggression. Defendant and his

friend Rodrigo Dominguez argued with Solisz on the telephone, and eventually Solisz agreed to bring his friends to a fight where Defendant and his friends would defend the girl from the disrespect. The two groups agreed to meet at a shopping center parking lot and arrived there in separate cars.

{7} Defendant arrived with Dominguez, Nachima Coriz, and others at the rendezvous. *McClaugherty I*, 2003–NMSC–006, ¶ 5, 133 N.M. 459, 64 P.3d 486. Solisz arrived with his friends, Vincent Martinez and Eloy Sandoval. Martinez brandished a baseball bat. *Id.* ¶ 6. There was testimony that Defendant and his friends brought two handguns and a shotgun with them. Shots fired from Defendant's group fatally wounded Solisz and injured Martinez. The police determined that the fatal shot had come from a handgun; however, they recovered only one handgun and they could not determine if that gun had fired the fatal shot.[1] After the early morning shootout, Defendant and Coriz hid all day in a nearby apartment. That evening, Coriz turned himself in to the police and gave them a statement inculpating Defendant and Dominguez. 2003–NMSC–006, ¶¶ 5–6, 8–9, 133 N.M. 459, 64 P.3d 486.

{8} Coriz testified for the State at Defendant's trial and was the only witness to identify Defendant as one of the young men who fired a gun on the night of the murder. Coriz testified that Defendant carried a pistol to the scene on the night of the murder and that he saw Defendant and another person get out of their car and run toward a fence bordering the parking lot. Coriz claimed that Defendant turned and shot at Solisz's car between five and seven times while he was running, then turned and jumped over the fence. Coriz also testified that after he, Defendant and Dominguez returned to Defendant's apartment, he heard Defendant tell his sister that they "went and shot at some people." After the State rested, defense counsel called Defendant to the stand, where he was the last witness to testify. During Defendant's cross-examination, Montoya repeated statements he claimed were contained

in witness statements to the police and drew a hearsay objection from defense counsel. *Id.* ¶¶ 9–14. Montoya's description of these witness statements during cross-examination became the subject of Defendant's first appeal to this Court. *See Id.* ¶ 3.

## B. Our Analysis in *McClaugherty I* - the Hearsay Introduced During Defendant's Cross–Examination

{9} In *McClaugherty I*, we reproduced the colloquy between Defendant and Montoya, and repeat it here for ease of reference. During his testimony, Defendant denied that he handled or fired a gun on the night of the murder. On cross-examination, Montoya asked Defendant if he told his sister and his roommate what happened that night. Defendant answered: "I had told them, yes, I was there and I ran." *McClaugherty I*, 2003–NMSC–006, ¶ 11, 133 N.M. 459, 64 P.3d 486. Montoya continued to question Defendant while holding papers in his hand:

Q: Is that all you told them?

A: I'm pretty sure.

Q: You're aware I've got statements? You got copies of the statements.

A: Yes.

Q: So why are they lying about you then?

A: Can you tell me what you're referring to?

At this point defense counsel objected to the State's line of questioning. During the subsequent bench conference, defense counsel argued to the court:

Defense: He's trying to impeach him with hearsay that's never been admitted into evidence.

[Montoya]: Inconsistent statements of admission.

Court: Do we have statements from these people that say something opposite to what he's saying?

[Montoya]: When they were talking about the shooting, at first he—

Court: I think what you're doing is the objection is really to the form of the question. You can ask him, "Would it

---

1. Defendant and Dominguez were each charged with homicide for firing the shots that killed Solisz and injured Martinez. Dominguez was convicted of voluntary manslaughter and other crimes. *State v. Dominguez*, 2005–NMSC–001, ¶ 1, 137 N.M. 1, 106 P.3d 563.

surprise you if somebody else said this, like as far as something—you know, why are they lying about you?" You're assuming facts not in evidence, so I'm going to sustain the objection on that particular ground, okay?

[Montoya] then returned to the cross-examination by asking Defendant, "[s]ir, would it surprise you to hear that your sister, Sarah Tucker, gave a statement to the police 6/19/99, the day after or the day, that morning, that said that you admitted to her that you shot—." At this point defense counsel objected again. At the bench conference, defense counsel argued:

Defense: He is attempting to impeach him with extrinsic evidence of which I have no opportunity to cross-examine him with, under what circumstances or anything else.

Court: Anything for your record?

[Montoya]: Your Honor, [Sarah] Tucker is actually his sister. She's been subpoenaed. She's been available. She won't come up to our office. [Defense counsel] has had the opportunity to interview her.

Court: The question that's being asked is whether or not he agrees with this or not is not—I mean because this person can always be brought in to explain it, so I'm going to allow him to proceed and allow him to ask the question, so I'm going to overrule the objection.

[Montoya] then continued to question Defendant:

Q: Do you remember the question?

A: Yes.

Q: Does it surprise you?

A: Yes.

Q: How about your roommate, Sherri Goen? Does it surprise you that she also made the same statement?

A: Yes.

Q: That you admitted shooting?

A: Yes.

Q: Bragged about it?

A: Yes.

*Id.* ¶¶ 11–14. During redirect examination, Defendant disagreed with Montoya's version of the girls' police statements saying that he had read the statements and they contained references only to him denying any shooting. At this point in the redirect, Montoya objected and argued to the district court that defense counsel just "elicited a lie," stating: "He said he shot. Do you want me to let that go?" and "They both admit that he said that he shot at the guys." Defense counsel responded that the State was free to bring in the declarant of those statements, but that Montoya's characterizations of the statements "should have never come in in the first place."

{10} In *McClaugherty I*, we agreed that the statements Montoya had made during his cross-examination contained hearsay not subject to any exception. *Id.* ¶ 16. We held that the cross-examination was improper in its use of hearsay, and it was not harmless. *Id.* ¶¶ 34–35. We reversed the convictions and remanded for a new trial. *Id.* ¶ 35.

## C. Events After Our Remand to District Court

{11} After we remanded the case, Defendant's new defense counsel received and reviewed the police statements of Tucker and Goen that had been in Montoya's possession during his impeachment of Defendant at trial. Defense counsel determined that the statements did not contain any references to Defendant "bragging" about the shooting and did not include a statement from Defendant's sister that Defendant "admitted he shot" the victim and presented a motion to the district court to bar further prosecution. In the motion, defense counsel explained to the trial court that the police statements from these witnesses did not contain the statements that Montoya claimed they did when he attempted to impeach Defendant at trial. Defendant's counsel concluded in his memorandum in support of the motion to bar further prosecution that "Montoya certainly knew, or must be presumed to have known … that his false characterization of the statements [given to the police by Sarah Tucker and Sherri Goen] was 'improper and prejudicial'; and he 'act[ed]' in willful disregard of the resulting … reversal' " such that retrial should be

barred pursuant to *Breit*, 1996–NMSC–067, ¶ 32, 122 N.M. 655, 930 P.2d 792.

{12} Prosecutor Troy Davis, Montoya's co-counsel at the first trial, represented the State after remand for a new trial and filed a response describing Montoya's impeachment of Defendant as "an isolated instance in an otherwise fair trial." In the response, Davis claimed that a "prosecutor acting out of error or negligence, or mistake" does not subject the State to the sanction of a bar to retrial because his behavior does not rise to the level of "willful disregard" as required by *Breit* to bar reprosecution. *Id.* ¶ 48.

{13} The district court set the matter for an evidentiary hearing. At the hearing, the State did not call any witnesses. Conceding that Montoya's questioning of Defendant about the statements made by Tucker and Goen had been improper, the State argued that it was an isolated instance in an otherwise fair trial and that Montoya's questions were not in evidence, only Defendant's responses were evidence. Orally, the district court told the parties:

> Certainly, if this Court had known about what was transpiring during the trial, the Court would have put a stop to it immediately and declared a mistrial in that case. But unfortunately the Court didn't know what was transpiring at the time and this Court was under the presumption that the District Attorney was asking those questions in good faith.

Granting Defendant's motion to bar further prosecution and dismissing the matter with prejudice pursuant to New Mexico Constitution, Article II, Section 15, NMSA 1978, Section 30–1–10 (1963), and *Breit*, the district court entered a written order with the following findings:

1. In the course of cross-examining defendant Charles I. McClaugherty at trial in this matter, Assistant District Attorney Kenny Montoya questioned Mr. McClaugherty about statements given by his sister Sarah Tucker and his roommate Sherri Goen to the police on June 19, 1999. In his questions to Mr. McClaugherty and in a colloquy at the bench, Mr. Montoya grossly misrepresented the content of those statements.

2. If the Court had known of Mr. Montoya's misconduct at the time, it would have granted a mistrial.

3. Mr. Montoya's misconduct was so unfairly prejudicial to Mr. McClaugherty that it could not have been cured by means short of a mistrial or a motion for new trial.

4. Mr. Montoya either knew, or must be presumed to have known, that his conduct was improper and prejudicial to Mr. McClaugherty.

5. Mr. Montoya acted in willful disregard of the potential consequences of his misconduct. He either was actually aware, or must be presumed to have been aware, that his misconduct had the potential to result in a mistrial or a reversal. Mr. Montoya made a conscious and purposeful decision to dismiss any concern that his conduct might lead to a mistrial or reversal.

The State timely appealed this dismissal to the Court of Appeals.

### D. The State's Subsequent Motions

{14} Fifteen days after filing its appeal, the State filed a motion in district court for voluntary dismissal of the appeal and a motion to reopen the proceedings so that Montoya could come testify to "dispute" and "defend himself against" the trial court's findings in its Order of Dismissal. The day after the motions were filed, the district court scheduled a hearing in district court on both of the State's motions.

{15} Before the hearing on the merits of these motions, Defendant filed a motion in the Court of Appeals to dismiss the State's pending appeal because the State had failed to timely file a docketing statement. Determining that the State's motions were "a motion for voluntary dismissal of its appeal and motion for reconsideration, which requested that the district court reopen the hearing that led to the dismissal of this case," the Court of Appeals denied Defendant's motion and remanded the matter to the district court "for the limited purpose of ruling on the State's pending motions." The Court of Appeals further ordered that if the district

court denied the State's motion to dismiss its appeal, the State would have twenty days from the district court's denial of that motion within which to timely file a docketing statement.

{16} The district court commenced the hearing on the motions by asking if there was any objection to dismissing the State's appeal. After clarifying that there was no opposition from Defendant, the district court articulated, "If there's a stipulation of that, we'll go ahead and grant the State's motion for dismissal of the appeal." The district court granted the State's motion and dismissed the pending appeal.

{17} The district court then addressed the State's motion to reopen the hearing. Defendant argued against reopening the hearing on jurisdictional grounds, relying on the language of Section 39–1–1. Defendant claimed that Section 39–1–1 clearly states that motions attacking a final judgment that are not acted upon by the district court are deemed denied thirty days after their filing, and approximately sixty days had elapsed since the State filed its motion. The State responded that the district court had jurisdiction because either (1) the thirty-day time period for hearing the post-judgment motion should have been calculated from the date the Court of Appeals remanded the matter to the district court for the limited purpose of ruling on the State's pending motions or (2) the thirty-day period should have been calculated from the district court's dismissal of the State's appeal in open court.

{18} The district court determined that Section 39–1–1 authorized a district court to, in its discretion, "grant additional time" to hear a matter raised in a timely filed post-trial motion. Because it originally set the State's motions for hearing and subsequently granted continuances within thirty days of their filing, the district court believed that it would be unjust to deny the court the opportunity to hear a timely raised matter if its docket precluded any earlier setting. The district court ruled that it had jurisdiction to consider the motion and reopened the hearing on the *Breit* dismissal to receive additional evidence. A full discussion of the evidence and the district court's decision are outlined

in detail later in this Opinion. Montoya testified that he believed his actions at the trial were proper. The district court (1) found that Defendant had established that Montoya's conduct met the first prong of the *Breit* test; (2) determined that the second two prongs were not met; and (3) denied Defendant's motion to bar further prosecution. *McClaugherty II*, 2007–NMCA–041, ¶ 44, 141 N.M. 468, 157 P.3d 33. The district court vacated its earlier dismissal of the matter, denied Defendant's motion to bar retrial, and reinstated the case for trial. Defendant then appealed to the Court of Appeals.

## E. Defendant's Appeal from the District Court

{19} The Court of Appeals' majority affirmed the district court and held that under Section 39–1–1 the district court had been divested of jurisdiction to hear the State's motion to reopen the hearing until the State's appeal had been resolved by dismissal, and after the dismissal of the appeal, the district court properly exercised its discretion pursuant to Section 39–1–1 to reopen the hearing and ultimately consider the evidence presented by the State. *McClaugherty II*, 2007–NMCA–041, ¶¶ 37, 40, 53, 141 N.M. 468, 157 P.3d 33. The Court of Appeals correctly articulated that, to be successful, Defendant's claim had to establish all three prongs of the *Breit* test: (1) improper official conduct so unfairly prejudicial to the defendant that it cannot be cured by means short of a mistrial or a motion for a new trial; (2) the official knows that the conduct is improper and prejudicial; and (3) the official either intends to provoke a mistrial or acts in willful disregard of the resulting mistrial, retrial, or reversal. *Id.* ¶ 42 (citing *Breit*, 1996–NMSC–067, ¶ 32, 122 N.M. 655, 930 P.2d 792). The Court of Appeals' majority reasoned that it had to find that Defendant failed to meet only a single prong of the *Breit* test to affirm the trial court's conclusion that Defendant's *Breit* claim failed. *Id.* ¶ 44. Relying heavily on the trial court's factual finding that the State would not have gained a tactical advantage from a mistrial in this case to conclude that the third prong of the *Breit* test was not met, the majority upheld the trial court's conclu-

sion that Defendant had not met the *Breit* threshold for barring reprosecution. *Id.* ¶¶ 48–51. Judge Kennedy's dissent, while agreeing with the majority that the district court had jurisdiction to hear the motion to reopen the case, disagreed with the district court's *Breit* analysis. *Id.* ¶ 55. The dissent would have reversed the district court and barred retrial due to severe prosecutorial misconduct. *Id.* ¶¶ 105–106.

{20} Defendant petitioned this Court for review of the Court of Appeals' published Opinion. We granted certiorari to determine, under Section 39–1–1, whether filing an appeal divests the trial court of its jurisdiction to hear a timely filed post-judgment motion and whether or not the legislature intended that a post-judgment motion be automatically denied by operation of law thirty days after it was filed, where a trial court had to set the motion for hearing outside of the thirty-day time period due to requests for continuance and the press of court business. We also granted certiorari to clarify the proper standard by which courts should review a defendant's deprivation of due process by prosecutorial misconduct.

## II. DISCUSSION

### A. Does the Thirty–Day Period that Section 39–1–1 Sets for the District Court to Decide a Motion to Reconsider a Final Judgment Expire During the Pendency of an Appeal?

{21} With regard to Section 39–1–1, this case presents the narrow issue of the jurisdiction of the district court to decide a motion, filed in the district court against a final judgment, when a notice of appeal was already filed and pending in the Court of Appeals. This matter is reviewed de novo, as it presents a clear question of statutory construction. *State v. Smith*, 2004–NMSC–032, ¶ 8, 136 N.M. 372, 98 P.3d 1022. The primary focus of statutory analysis is to ascertain and give effect to legislative intent. *Cummings v. X–Ray Assocs. of N.M., P.C.*, 1996–NMSC–035, ¶ 44, 121 N.M. 821, 918 P.2d 1321.

{22} After completing a historical analysis, the Court of Appeals initially clarified that "Section 39–1–1 does not grant jurisdiction to the district court, but, rather, limits the period of time that a district court may act on a case over which it has jurisdiction." *McClaugherty II*, 2007–NMCA–041, ¶ 33, 141 N.M. 468, 157 P.3d 33. Relying upon our case, *Kelly Inn No. 102, Inc. v. Kapnison*, 113 N.M. 231, 824 P.2d 1033 (1992), the Court of Appeals held that when an appeal is pending, jurisdiction over the case resides in the appellate court, except for a few specific, enumerated exceptions, and that the motion in this case is not one of those exceptions. *McClaugherty II*, 2007–NMCA–041, ¶¶ 34–35, 141 N.M. 468, 157 P.3d 33. The Court of Appeals clarified that although Section 39–1–1 has been discussed in the context of jurisdiction, by its language and history, ultimately, it is the constitution that grants the district court its jurisdiction. *Id.* ¶ 33; *see* N.M. Const. art. VI, § 13.

{23} In *Kelly Inn*, we addressed the authority of the district court to dispose of matters either after an appeal is taken or after thirty days has passed as calculated under Section 39–1–1. 113 N.M. at 241–43, 824 P.2d at 1043–45. We held that a notice of appeal does not deprive the district court of jurisdiction to act on motions, within thirty days of their filing when those motions deal with matters collateral to, or separate from, the issues resolved in the judgment being appealed. *Id.* at 243–44, 824 P.2d at 1045–46. However, we clarified that when the motion requests further action that will affect the judgment that is the subject of the appeal, the district court is divested of jurisdiction by the pending appeal. *Id.* at 241, 824 P.2d at 1043.

{24} In the case at bar, because the State filed its motion to reopen the hearing to bar reprosecution in district court fifteen days after filing its notice of appeal in the Court of Appeals, the district court no longer had any ability to act on the motion. Therefore, until the appeal was dismissed, the State's motion to reopen the hearing was not deemed denied pursuant to Section 39–1–1 because the district court could not have acted on the motion while the appeal was pending. We affirm the district court and the Court of Appeals on this issue.

**B. Do the Facts of this Case Substantiate a Bar to Retrial Under the Double Jeopardy Principles of *Breit*?**

**1. The *Breit* Standard**

 {25} As we said in *Breit*, "[r]aising the bar of double jeopardy should be an exceedingly uncommon remedy." 1996–NMSC–067, ¶ 35, 122 N.M. 655, 930 P.2d 792. This remedy applies only in cases of "the most severe prosecutorial transgressions." *State v. Gonzales*, 2002–NMCA–071, ¶ 14, 132 N.M. 420, 49 P.3d 681. In *Breit*, we diverged from the federal precedent articulated in *Oregon v. Kennedy*, 456 U.S. 667, 674–75, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), to hold that Article II, Section 15 of the New Mexico Constitution permits a bar to retrial under double jeopardy principles when (1) improper official conduct is so unfairly prejudicial to the defendant that it cannot be cured by means short of a mistrial or a motion for a new trial; (2) if the official knows that the conduct is improper and prejudicial; and (3) if the official either intends to provoke a mistrial or acts in willful disregard of the resulting mistrial, retrial, or reversal. *Breit*, 1996–NMSC–067, ¶ 32, 122 N.M. 655, 930 P.2d 792. Instituting our narrow expansion of the *Kennedy* rule, we held:

> It makes little difference, when the constitutional rights of the defendant are at stake, whether the prosecutor deliberately pursues an improper course of conduct because he means to goad a defendant into demanding a mistrial or because he is willing to accept a mistrial and start over. From the standpoint of a defendant forced to choose between accepting prejudicial errors or undergoing a second trial, the precise degree of the official's mens rea is a matter of indifference.

*Id.* ¶ 35 (quoted authority omitted).

██ {26} *Breit* focuses on the *effect* of the prosecutorial misconduct on the defendant, regardless of the prosecutor's intent, because

> [t]he object of constitutional double-jeopardy provisions is not to punish disreputable prosecutors. The purpose, rather, is to protect the defendant's interest in having the prosecution completed by the original tribunal before whom the trial was commenced. Defendants should be protected from reprosecution once a prosecutor's actions, *regardless of motive or intent,* rise to such an extreme that a new trial is the only recourse.

*Id.* ¶ 22 (emphasis added)(quoted authority omitted).

{27} In *Breit*, we rejected the subjectivity allowed under *Kennedy*, 456 U.S. at 674–75, 102 S.Ct. 2083 and instituted this objective standard. *Breit*, 1996–NMSC–067, ¶¶ 23, 32, 122 N.M. 655, 930 P.2d 792. Therefore, the *Breit* objective standard is based on the prosecutor's conduct as it manifests at the trial, not the motivation for that conduct. We cannot overemphasize or overstate that this is an objective standard, not a subjective one: the belief of the prosecutor regarding his or her own conduct is irrelevant in this analysis.

{28} We begin by outlining the facts developed after our remand, and then evaluate Montoya's trial misconduct using the *Breit* three-prong test for determining whether a double jeopardy bar to retrial is the proper remedy in this case. *Id.* ¶ 32. The district court's findings that concern us most are (1) Montoya "did not know or can be presumed not to have known that [his] conduct was improper and prejudicial" and (2) Montoya "had an honest belief that his questions [to Defendant on cross-examination] were proper."

**2. Facts Developed after our Remand to the District Court for a New Trial**

{29} As we discussed above, the State filed motions in the district court for voluntary dismissal of the appeal and to reopen the proceedings, and both were granted. Once the hearing was reopened, the State called Montoya to testify. Montoya testified that when he cross-examined Defendant at trial about what Tucker and Goen had said in their statements to police, he had actually based the cross-examination questions about Defendant "shooting" and "bragging about" it on "all the statements together as one whole statement," relying on "a stack of statements" from "all the witnesses who [had] given statements," and "[a]ll the evidence in the case." Montoya clarified that, during his cross-examination of Defendant

about the Sarah Tucker statement, which he referred to as "a statement to the police 6/19/99," he actually relied on other material. Montoya testified that the bases for those questions included not only the June 19th statement but also an undocumented and unrecorded statement that Montoya claimed Ms. Goen made to him personally. Montoya stated, "Your Honor, Ms. Goen actually came to the office and that [is] not a statement you have." Montoya elaborated saying that, "Sherri Goen came in, broke down very quick, started crying, saying 'I'm very afraid, got to let you know what happened. He came up, he was bragging that he shot him.' He said, 'we did it.' "

{30} Describing this alleged second statement from Goen, Montoya testified that it was given to him by Goen with her former lawyer present as well as a female whom he later said was a police officer, a detective, or a victim impact person. He said that Defendant's former lawyer stopped the interview and agreed to a plea right then "because Ms. Goen was so definite in front of us there in person that [Defendant] came up and bragged." Through Montoya, the State introduced a pretrial interview notice to Goen for Thursday, February 24, 2000, the date Goen allegedly gave the second statement. Montoya couldn't set the precise time, but remembered that the interview did not take place in his office but in a conference room. The content of the interview that he remembered was that Goen claimed that Defendant bragged to her that he had shot *and killed* the victim.

{31} Montoya testified that he did not contemporaneously tape record or take notes of this brief, two-minute interview with Goen; he never provided this statement to the defense; he never had any intention to call Goen to testify at trial; and he did not mention this statement to his trial co-counsel until just before the hearing on the motion to reopen. However, Montoya said that his confidence to form his "good faith" questions to Defendant came from him "adding that all up together" after this interview with Goen: both her police statement and "[her] statements in my office to me personally." He testified Defendant's attorney was "smart

enough" to stop the interview when Goen stated that Defendant told her not merely that he had shot a gun, but that he had killed the victim. Montoya claimed he and Defendant's attorney walked out of the interview right then, talked about a plea for Defendant, and "came to an agreement." Montoya told the district court that, based on his own review of all the statements and evidence, "I'm sure, as sure as somebody could be that wasn't there, that Mr. McClaugherty came up and bragged about it. Shooting an innocent victim and killing an innocent victim." Montoya additionally claimed that the evidence in the case was "overwhelming," "one of those cases [where] we didn't have to [go] back on [it] being a first-degree [murder]."

{32} The district court continued the matter to allow defense counsel to interview the potential witnesses Montoya had identified from the interview with Goen: Defendant's former counsel and Goen's counsel. The hearing recommenced, primarily on the topic of Goen's alleged statement to Montoya.

{33} Defendant's former defense attorney testified he did not remember being present at the Goen statement described by Montoya. He did, however, say that he would never stop an interview statement where a witness made damaging statements about his client because he found it helpful to know damaging facts as well as helpful facts. He also said that he did not reach a plea agreement with Montoya after any witness interview because "[t]he plea negotiations were ongoing before interviews, after interviews, so no." Later, with no objection from the State, defense counsel offered into evidence a copy of a plea offer sent from Montoya to this defense attorney. The plea offer, dated April 27, 2000, was made about two months after the date of Goen's alleged second, personal statement to Montoya wherein she said that he shot and killed the victim and bragged about it. The offer was to dismiss the open count of murder and the first-degree felony murder charges in exchange for a plea to conspiracy to commit first-degree murder, aggravated battery and shooting at or from a motor vehicle.

{34} The State elicited from Goen's attorney that she received a subpoena for Goen's

pretrial interview scheduled for August 29, 2000. She remembered being present at that interview with Montoya and Goen, it took place in Montoya's "individual room" lasting "not more than an hour", and no one else was in Montoya's office during the interview.

{35} At the close of evidence from these hearings, the State argued that the trial objection to Montoya's cross-examination of Defendant had been "improper impeachment," not an objection that Montoya had asked the question in "bad faith," and that Montoya's "good faith" basis for the questions he asked came from all the evidence against Defendant of which Montoya was aware of at the time he posed the questions.

{36} Defense counsel responded that Montoya's misrepresentation during his cross-examination was when he asked Defendant, "Sir, would it surprise you to hear that your sister, Sarah Tucker, gave a statement to the police, 6–19–99, that day or that morning that said that you admitted to her that you shot?" Defense counsel quoted from the earlier hearing where the district court had dismissed the State's case with prejudice, saying, " 'It is clear through those witness's statements that the statement to the police was that the Defendant did not shoot and was not the shooter.' " Defense counsel reiterated that the Goen statement to the police does not contain a single reference to Defendant "bragging" that he had shot the victim. However, after his question about the Tucker statement, Montoya peppered Defendant with questions about Goen, including, "How about your roommate, Sherri Goen? Does it surprise you that she also made the same statement? ... That you admitted shooting? ... Bragged about it?" Defense asked the district court to adhere to its earlier dismissal of the case.

### 3. The District Court's Final Ruling on the *Breit* Issue

{37} At the conclusion of the hearings on the motion to reopen, the district court found *inter alia* that (1) Montoya "did not know or can be presumed not to have known that [his] conduct was improper and prejudicial"; (2) Montoya "had an honest belief that his

questions were proper"; (3) Montoya "did not act in willful disregard"; (4) Montoya's "misconduct does not appear to be the result of a plan or scheme to inject unfair prejudice into the trial"; and (5) Montoya did not "seek a tactical advantage through his conduct [n]or would the State have gained a tactical advantage because of a mistrial." The district court then concluded that Montoya's conduct did not evince the "extraordinary circumstances that would require barring a retrial" ruling that the "Order of Dismissal filed on May 8, 2003 be vacated" and Defendant's "Motion to Bar further Prosecution be Denied."

{38} The district court concluded that the only prong of the *Breit* test that was met was that if the court had known about Montoya's misconduct at the time he was introducing the inadmissible hearsay, it would have granted a mistrial. The district court did not construe the facts to meet the other two prongs of *Breit*. Defendant appealed these conclusions to the Court of Appeals, which affirmed the district court. *McClaugherty II*, 2007–NMCA–041, ¶ 2, 141 N.M. 468, 157 P.3d 33.

### 4. The First *Breit* Prong: Was the Improper Official Conduct so Unfairly Prejudicial to the Defendant that it Cannot be Cured by any Means Short of a Mistrial or a Motion for a New Trial?

{39} An appellate review of a prosecutorial misconduct claim presents a mixed question of law and fact. The appellate court will defer to the district court when it has made findings of fact that are supported by substantial evidence and reviews de novo the district court's application of the law to the facts. *See State v. Armijo*, 118 N.M. 802, 811, 887 P.2d 1269, 1278 (Ct.App.1994) (deferring to the district court's factfinding in alleged prosecutorial misconduct case and then treating as a matter of law, reviewed de novo on appeal, the issue of whether the record supports a finding of conduct by the prosecution that so violated required legal norms as to justify sanctions).

{40} At the hearing on the motion to reopen, the trial court evaluated Montoya's tri-

al conduct through the lens of his testimony. At this reevaluation, the trial court did not disturb its initial ruling that Montoya's use of hearsay during his cross-examination of Defendant was improper. At the conclusion of the additional evidence and Montoya's testimony at the hearings on the motion to reopen, the trial court adhered to its original ruling on this issue.

■ {41} We agree with this conclusion. Montoya, in his cross-examination of Defendant, referred to two specific statements given by Goen and Tucker that the State has failed to prove ever existed. If the State's explanation for Montoya's cross-examination questions is that Montoya was actually relying on other material in support of his questions, it was incumbent on the State to prove the existence of such material. Absent such proof, we are dealing with a prosecutor who introduced two specific hearsay statements that simply did not exist. The actual police interviews conducted on June 19, 1999, do not contain statements from either Tucker or Goen that Defendant confessed that he shot and then bragged about it. However, instead of presenting both Goen and Tucker to testify themselves that they made the statements in question, the State chose to rely solely on Montoya's explanation. This explanation was, in large part, dependant upon the alleged interview with Goen. However, even if we assume that this interview took place, the addition of the content of the Goen interview to the calculus does not change the conclusion that a prosecutor may not introduce facts not in evidence through his or her questions. In *State v. Bartlett*, 96 N.M. 415, 418, 631 P.2d 321, 324 (1981), we pointed out that "[a] prosecutor who cross-examines in the form of leading questions, which he has a right to do, is the witness who testifies before the jury, not the defendant. The questions asked [in this case] were equivalent of testimony by the prosecutor. . . ." Here, when we reversed Defendant's convictions and remanded for a new trial, we explained that the State could have gained the admission of the Goen and Tucker statements:

A proper way to conduct the impeachment would have been for the State to ask Defendant if he told them that he shot a gun that night. After Defendant denied making such a statement, then the State could have called them to testify. If either his sister or his roommate had testified that he admitted shooting a gun, the jury would have had admissible evidence of the statement to which the prosecutor referred during cross-examination. *See* Rule 11–801(D)(2)(a). Further, if either had testified and denied that Defendant made the statement, the State could have impeached the witness with any prior inconsistent statements made to the police. *See* Rule 11–613.

*McClaugherty I*, 2003–NMSC–006, ¶ 29, 133 N.M. 459, 64 P.3d 486. This analysis applies to the alleged Goen interview as well. The State is incorrect that the additional quantum of hearsay, the Goen interview material, somehow makes any of the hearsay material admissible through Montoya.

{42} We do not disturb the trial court's ruling that Montoya's use of hearsay during cross-examination of Defendant was improper. This is a proper ruling on this first prong of the *Breit* analysis. 1996–NMSC–067, ¶ 32, 122 N.M. 655, 930 P.2d 792; *see also Attaway*, 117 N.M. at 144, 870 P.2d at 106 (deferring to the district court when it has made findings of fact that are supported by substantial evidence). This is also consistent with our analysis and holding in *McClaugherty I*, that the trial court abused its discretion in permitting the prosecutor to refer to the statements that Tucker and Goen allegedly made to the police without calling them to testify to those remarks, and the reference to these statements, at the very least, violated the hearsay rule and was not harmless. This conduct was so unfairly prejudicial to Defendant that it could not be cured short of a new trial. *McClaugherty I*, 2003–NMSC–006, ¶ 35, 133 N.M. 459, 64 P.3d 486. Defendant has established that Montoya's misconduct satisfies the first prong of a *Breit* analysis. *Breit*, 1996–NMSC–067, ¶ 32, 122 N.M. 655, 930 P.2d 792.

**5. The Second *Breit* Prong: Did the Official Know that the Conduct Was Improper and Prejudicial?**

{43} The State urges us to find that the district court's factual findings that formed

the basis for its conclusion that "Mr. Montoya did not know or can be presumed not to have known that the conduct was improper and prejudicial" must be accorded deference by this Court pursuant to *State v. Rojo*, 1999–NMSC–001, ¶ 19, 126 N.M. 438, 971 P.2d 829 and *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). The State further posits that this Court cannot substitute its judgment for that of the factfinder, and should uphold the district court's finding that Montoya's testimony was credible to the issue that "Montoya had an honest belief that his questions were proper."

{44} Defendant contends that because a *Breit* claim is an assertion that Defendant's double jeopardy rights have been infringed upon, the double jeopardy issue is reviewed de novo pursuant to *State v. Bernal*, 2006–NMSC–050, ¶ 6, 140 N.M. 644, 146 P.3d 289, and this court should review underlying findings of historical fact under a substantial evidence standard as was done in *State v. Rodriguez*, 2006–NMSC–018, ¶ 3, 139 N.M. 450, 134 P.3d 737.

{45} Defendant faults the district court's particular finding that Montoya's conduct during the cross-examination "may amount to negligence" or "may amount to poor lawyering, perhaps inexperience in handling these types of cases, being somewhat naive, but I got the impression he honestly believed that what he was asking at trial was okay and was proper to do[,]" as contrary to Montoya's actual testimony on direct, where he boasted about his experience:

Q: How many murder trials have you done before?

A: I don't know. We used to joke about that one year period. I think I did more murder trials than everybody else put together in the state. It was not a good year for violent crimes happening throughout the state. I don't recall.

Q: You had homicide experience before then?

A: Yes, sir.

Q: You had quite a bit of trial experience before then?

A: Yes.

Defendant concludes that Montoya knew or was presumed to have known that his use of hearsay and "false characterization" of the police statements during cross-examination were improper and prejudicial and that *Breit* specifically rejects a district court's application of an "inexperience" rationale.

{46} We agree with Defendant that on a claim of prosecutorial misconduct, where factual issues are intertwined with a double jeopardy analysis, we review the district court's fact determinations under a deferential substantial evidence standard of review. *Gonzales*, 2002–NMCA–071, ¶ 10, 132 N.M. 420, 49 P.3d 681, (citing *Armijo*, 118 N.M. at 811, 887 P.2d at 1278); *accord Brule*, 1999–NMSC–026, ¶¶ 3–6, 127 N.M. 368, 981 P.2d 782.

**a. The District Court's Findings of Fact**

{47} After asking that we defer to the factual findings of the district court, the State did not point us to any testimony or evidence to support a factual finding that Montoya was an inexperienced lawyer, a naive practitioner, or a poor lawyer. The evidence, particularly Montoya's extensive testimony, is to the contrary. On direct examination, Montoya told the trial court he has "a couple of masters' degrees, [and] a law degree," that as an attorney for the District Attorney's office in Albuquerque he "entered every courtroom in this district court and metro court" and "went from metro services to white collar crimes to narcotics to violent crime division," and that he was the lead prosecutor on the *McClaugherty* case "[a]s well as other murder trials." He also testified that "[prosecutors] [u]phold the constitution to make sure that [Defendant] has the rights of that constitution and all [it stands] for. Prosecutor side, we don't cross the line, we can't. We have to protect too much."

{48} Even giving deference to the trial court's findings of fact we still conclude that the State has not pointed to any evidence in the record, nor have we found any ourselves, to support a finding that Montoya was a naive or inexperienced practitioner at the time of the misconduct. As in *Breit*, there was no conflict in the testimony. Montoya never complained that he was inexperienced

or naive about the role of a prosecutor, and the evidence from this hearing, on its face, is consistent with his assertions. *See Breit*, 1996–NMSC–067, ¶ 48, 122 N.M. 655, 930 P.2d 792 ("There is no suggestion in the record that the prosecutor acted out of error, or negligence, or mistake."). The trial court erred in finding to the contrary and we do not defer to a clearly erroneous finding. *See Herrera v. Roman Catholic Church*, 112 N.M. 717, 721, 819 P.2d 264, 268 (Ct.App. 1991) ("Unless clearly erroneous or deficient, findings of the trial court will be construed so as to uphold a judgment rather than to reverse it.").

**b. Is Montoya Presumed to Know that His Conduct was Improper or Prejudicial?**

{49} "[T]here must be a point at which lawyers are conclusively presumed to know what is proper and what is not." *Pool v. Superior Court*, 139 Ariz. 98, 677 P.2d 261, 270 (1984) (en banc). Behavior falling short of intentional misconduct may be sufficiently egregious to trigger double jeopardy protections. *State v. Lucero*, 1999–NMCA–102, ¶¶ 15–16, 127 N.M. 672, 986 P.2d 468. Reprosecution can be barred even when the prosecutor did not know that the conduct was improper and prejudicial. *Id.* As we have indicated, this is an objective standard, not a subjective one. A prosecutor's belief regarding their own conduct is irrelevant because "[r]are are the instances of misconduct that are not violations of rules that every legal professional, no matter how inexperienced, is charged with knowing." *Breit*, 1996–NMSC–067, ¶ 33, 122 N.M. 655, 930 P.2d 792 (citing *Pool*, 139 Ariz. 98, 677 P.2d 261 at 270). The law simply cannot reward ignorance.

{50} This is not a new concept in New Mexico. For example, in *State v. Huff*, the Court of Appeals held that *Breit's* knowledge test was satisfied by presuming knowledge on the part of a prosecutor who introduced "irrelevant, misleading, and prejudicial testimony." 1998–NMCA–075, ¶ 21, 125 N.M. 254, 960 P.2d 342. The *Huff* Court concluded that prohibitions against proffering evidence without an adequate legal and factual foundation was "not a subtle point of law, and one we can presume any prosecuting attorney to know." *Id.* Simply put, "[a] prosecutor should know the rules of evidence. At the very least, a prosecutor should know a fundamental rule of evidence." *Id.* ¶ 18. The fundamental rule of evidence at issue here is the rule governing the admissibility of hearsay.

{51} Even after we reversed Defendant's convictions in a published opinion for Montoya's improper impeachment with hearsay, during his testimony at the hearing on the motion to reopen, Montoya insisted that the additional hearsay from Goen's alleged private statement to him gave him a proper basis to insert the hearsay into the proceedings because he believed "it was the truth." We explained in *McClaugherty I* that the proper way for the State to have gained admission of Goen's alleged statements would have been to call her as a witness. 2003–NMSC–006, ¶ 29, 133 N.M. 459, 64 P.3d 486. At trial, Montoya did not disavow the district court of its misinterpretation that the declarants would be testifying. When defense counsel objected to Montoya's cross-examination wherein he was clearly using hearsay to impeach Defendant, Montoya told the court, "[y]our Honor, [Sarah] Tucker is actually his sister. She's been subpoenaed. She's been available." *Id.* ¶ 13. The district court responded, overruling the defense objection and telling the parties, "this person can always be brought in to explain it, so I'm going to allow him to proceed and allow him to ask the question." *Id.* It was not until the reopened hearing on the motion to bar reprosecution that Montoya told the court he had no intention of presenting the statements, stating, "I wasn't going to admit the evidence" and "I didn't expect [Goen] to [be at the trial]." Montoya concluded "I didn't expect her to be there, I know that the [d]efense and the family of the Defendants had access to them. They could have pulled them in." As we said in *McClaugherty I*, the burden was on the State, not the Defendant, to provide direct evidence of the statements if it intended to use them at trial to impeach. *Id.* ¶ 30.

{52} On appeal, the State continues to assert to us that (1) the hearsay from the

alleged Goen interview and an affidavit from Goen that she gave "a statement at an interview" provided Montoya with "solid support for asking his question about whether Defendant told Sherri Goen that he shot a gun that night" and (2) that the district court's ruling that Montoya had "an honest belief that his questions were proper" should be affirmed. We disagree. We reiterate that we know of no calculus by which Montoya's personal knowledge of an increased quantum of hearsay statements would somehow justify his improper use of the hearsay statements during cross-examination.

{53} With regard to whether the prosecutor should be charged with knowing the law regarding impeachment with hearsay evidence, Judge Kennedy's dissent in *McClaugherty II* identified the correct legal standard and we rely heavily on this part of the dissent to explain the evolution of this concept. *See generally McClaugherty II*, 2007–NMCA–041, ¶¶ 85–92, 141 N.M. 468, 157 P.3d 33. (Kennedy, J., concurring in part and dissenting in part). The dissent initially noted that "[t]he practice of injecting improper matters through cross-examination is so broadly prohibited that a presumption that prosecutors know to avoid the practice is warranted." *Id.* ¶ 85. This is because,

[i]t is improper under the guise of artful cross examination to tell the jury the substance of inadmissible evidence. The attempt to communicate impressions by innuendo through questions which are answered in the negative ... when the question has no evidence to support the innuendo, is an improper tactic which has often been condemned by the courts. A lawyer shall not ... in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence.

*Id.* (quoted authority omitted).

{54} New Mexico consistently holds "that counsel should not argue facts outside the record, looking to ABA Prosecution Standards and other accepted norms as benchmarks by which to gauge prosecutorial conduct." *Id.* ¶ 86. Particularly compelling for its relevance to the specific facts of this case is the dissent's use of The National

District Attorneys Association, *National Prosecution Standards* § 77.4 (2d ed.1991):

Prior recorded statements which are materially inconsistent with the testimony of a witness may be introduced as substantive evidence of the content of the prior statement *if the person who elicited, witnessed, or recorded the statement is available for confrontation and cross-examination and after the witness has been given an opportunity, under oath, to explain or deny the prior statement.*

*Id.* ¶ 86. (emphasis added in *McClaugherty II* ).

{55} When addressing impeachment specifically made by prosecutors, the Tenth Circuit has held that "[A] prosecutor may not use impeachment as a guise for submitting to the jury substantive evidence that is otherwise unavailable." *United States v. Silverstein*, 737 F.2d 864, 868 (10th Cir.1984). "[N]either a prosecutor's good faith belief that some basis for [his or] her question exists nor reassurances to appellate courts drawn from information never presented below will suffice." *United States v. Elizondo*, 920 F.2d 1308, 1313 (7th Cir.1990). Montoya consistently and adamantly testified that he made no mistake when he asked Defendant the improper questions. Even if the prosecutor had a good faith basis for his questions, the statements "should not have been used on cross-examination," because "[t]he statements made to the police were not used simply to challenge the credibility of a witness's testimony, but to prove that Defendant actually admitted to shooting a gun on that night." *McClaugherty I*, 2003–NMSC–006, ¶¶ 24–25, 133 N.M. 459, 64 P.3d 486. An additional harm was done in that "[d]efendant was deprived of the chance to confront the declarants of the statements, or effectively counter the implications arising from the prosecutor's use of them." *McClaugherty II*, 2007–NMCA–041, ¶ 91, 141 N.M. 468, 157 P.3d 33. (Kennedy, J., concurring in part and dissenting in part).

{56} When we reversed Defendant's convictions for the prosecutor's improper use of hearsay in *McClaugherty I*, we said, "[t]he purpose of the rule is to protect against the

danger that a statement of a declarant is unreliable because it is not given under oath by a witness who is present at trial and subject to cross-examination." 2003–NMSC–006, ¶ 17, 133 N.M. 459, 64 P.3d 486 (citing 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 802.02[3], at 802–09 (Joseph M. McLaughlin ed., 2d ed.2002)).

{57} We decline the State's invitation to find that Montoya was a credible witness and to defer to the district court's conclusion that "Mr. Montoya did not know or can be presumed not to have known that the conduct was improper and prejudicial." The law clearly presumes that Montoya knew that his cross-examination of Defendant using either inadmissible hearsay or facts not in evidence, where he had no intention of trying to gain the proper admission of that material, was improper. Montoya's leading questions to Defendant accusing him of shooting and bragging about shooting was an inappropriate cross-examination because the questions were not predicated on facts in evidence. *See Martinez*, 2001–NMCA–059, ¶ 32, 130 N.M. 744, 31 P.3d 1018. The trial court was incorrect, Montoya knew or is presumed to have known that his use of hearsay in his cross-examination was improper and prejudicial to Defendant. Therefore, the second prong of *Breit* was met.

**6. The Third *Breit* Prong: Did the Official Intend to Provoke a Mistrial or Act in Willful Disregard of the Resulting Mistrial, Retrial, or Reversal?**

{58} To determine whether the prosecutor's conduct amounts to "willful disregard" of a resulting mistrial, retrial, or reversal, the appellate court "will carefully examine the prosecutor's conduct in light of the totality of the circumstances of the trial." *Breit*, 1996–NMSC–067, ¶ 40, 122 N.M. 655, 930 P.2d 792; *accord State v. Pacheco*, 1998–NMCA–164, ¶ 14, 126 N.M. 278, 968 P.2d 789. In *Breit*, we defined "willful disregard" as connoting "a conscious and purposeful decision by the prosecutor to dismiss any concern that his or her conduct may lead to a mistrial or reversal," while "emphasizing that the prosecutor is actually aware, or is pre-

sumed to be aware, of the potential consequences of his or her actions." *Breit*, 1996–NMSC–067, ¶ 34, 122 N.M. 655, 930 P.2d 792. The presumption that the prosecutor is aware of such consequences is established by the prosecutor's egregious conduct, not necessarily from an inference of a conscious and purposeful decision to bring about a mistrial. We have always intended the threshold of "willful disregard" to be high, stating that "[t]he idea that the misconduct must be so prejudicial as to cause a mistrial or new trial *suggests* that double jeopardy will rarely bar reprosecution if the misconduct is an isolated instance during the course of an otherwise fair trial." *Id.* ¶ 33 (emphasis added). Additionally, the test was intended to be a "narrow expansion" of the more restrictive federal standard established in *Kennedy*, and "[r]aising the bar of double jeopardy should be an exceedingly uncommon remedy." *Id.* ¶ 35.

{59} The reprosecution bar in *Breit* was based on the trial court's (1) findings that showed "the pervasive, incessant, and outrageous nature of the prosecutor's misconduct during [the defendant's] first trial," and (2) conclusion that the trial was "out of control." *Id.* ¶¶ 37, 41. (internal quotation marks omitted). We concluded that to avoid "an acquittal at any cost, it appears that among the costs the prosecution was willing to incur were a mistrial, a new trial, or a reversal on appeal." *Id.* ¶ 48.

{60} Here, we have a single incident of misconduct at trial: Montoya's introduction of nonexistent evidence at worst, or at best, inadmissible hearsay through his cross-examination questions. Defendant claims that Montoya's "willful disregard" is clear because the misconduct occurred shortly before the end·of trial, when the weakness of the State's case was apparent. The State reiterates that we should give deference to the trial court's factual findings that led to its conclusion that Montoya "did not act in willful disregard."

{61} At the reopened hearing on the motion to bar prosecution, Montoya directly denied that he was inserting hearsay during his cross-examination of Defendant even after we had published our analysis clearly explaining the material was hearsay. On direct

examination, Montoya testified he had relied, *inter alia,* on statements he obtained when he conducted an interview with Goen. He named two attorneys who were present at that interview, yet when the attorneys were called to testify, neither attorney confirmed that the interview had taken place. Moreover, the State failed to call Goen and Tucker to testify, the two witnesses who could have conclusively established that they indeed made statements that were consistent with Montoya's cross-examination of Defendant. Even assuming such statements exist, that the State elicited testimony and submitted exhibits establishing that the material Montoya used during his cross-examination of Defendant was hearsay and then argued that the hearsay established a "good faith basis" for the cross-examination questions, troubles us. Again, as we discussed previously, there is no "good faith basis" exception for the admission of hearsay. The rules of evidence are clear and our analysis on this specific instance of the use of hearsay at Defendant's trial had been published prior to Montoya's testimony:

> The statements that were used by the State did not serve only to impeach; they offered an admission by Defendant on an issue that was highly disputed at trial. Pursuant to Rule 11–801(D)(2), the exclusion of hearsay statements does not apply to admissions made by party-opponents. An opposing party may introduce out-of-court statements made by its opponent under the theory that the declarant party is in court and has the opportunity to deny or explain such statements, 5 Weinstein & Berger, *supra,* § 801.30[1][a], at 801–44, but the admission must be the party's own out-of-court statement, not statements made by a third party. *See* Rule 11–801(D)(2)(a) (excluding admissions by a party-opponent from the hearsay rule). In this case the statements offered by the State are not Defendant's own statements.

*McClaugherty I,* 2003–NMSC–006, ¶ 27, 133 N.M. 459, 64 P.3d 486. At the reopened hearing, the State further argued that it was "a shame that the Supreme Court had to step in and overrule the jury on this matter ... because they did not hear the testimony." This also troubles us. We rely on the transcript of proceedings to review the testimony at trial and our published opinions represent the sum of that work. The State did not file a motion for rehearing enumerating its concerns that we did not correctly apprehend the proceedings of the trial. *See* Rule 12–404(A) NMRA (a motion for rehearing "shall state briefly and with particularity, but without argument, the points of law or fact which in the opinion of the movant the court has overlooked or misapprehended.").

{62} Judge Kennedy's dissent in *McClaugherty II* noted that many courts have discussed the impropriety of injecting improper content into evidence through cross-examination questions. 2007–NMCA–041, ¶ 85, 141 N.M. 468, 157 P.3d 33. "It is improper under the guise of artful cross-examination to tell the jury the substance of inadmissible evidence." *United States v. Sanchez,* 176 F.3d 1214, 1222 (9th Cir.1999) (quoted authority omitted). Over twenty-five years ago the Court of Appeals announced that "[t]he attempt to communicate impressions by innuendo through questions which are answered in the negative ... when the question has no evidence to support the innuendo, is an improper tactic which has often been condemned by the courts." *Bartlett,* 96 N.M. at 418, 631 P.2d at 324 (quoted authority omitted). Our rules clearly state, "[a] lawyer shall not ... in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence." Rule 16–304(E) NMRA.

{63} In *McClaugherty I,* we reviewed Montoya's conduct through the lens of the hearsay rule because "[t]he purpose of the [hearsay] rule is to protect against the danger that a statement of a declarant is unreliable because it is not given under oath by a witness who is present at trial and subject to cross-examination." 2003–NMSC–006, ¶ 17, 133 N.M. 459, 64 P.3d 486. We concluded that Montoya's use of this highly prejudicial practice merited reversal of Defendant's convictions holding that "[t]he statements made to the police were *not* used simply to challenge the credibility of a witness's testimony, but to prove that Defendant actually admit-

ted to shooting a gun on that night." *Id.* ¶ 25.

{64} In *State v. Flanagan,* 111 N.M. 93, 97, 801 P.2d 675, 679 (Ct.App.1990), the Court of Appeals imposed a strict prohibition against asking the defendant if another witness is mistaken or lying and established as standard that such behavior is categorically improper. We agreed with that analysis in *State v. Duran,* 2006–NMSC–035, ¶¶ 18–21, 140 N.M. 94, 140 P.3d 515, because it is irrelevant at trial what one witness thinks of another witness' testimony. It is an enumerated duty of a juror to determine the weight to give to each witness' testimony. *See* UJI 14–5020 NMRA (Credibility of Witnesses). Even though Montoya stated he was neither familiar with nor believed in the existence of such a rule, he should have been able to deduce that cross-examining a witness by introducing statements that he did not intend to admit into evidence at trial and asking the witness on the stand to comment on the veracity of those statements was improper since the only evidence of the statements was his own questioning.

{65} In *Huff,* the Court of Appeals found that the prosecutor acted . in "willful disregard" of a resulting mistrial, but concluded that double jeopardy did not bar retrial because the first two prongs of the *Breit* test were not met. 1998–NMCA–075, ¶¶ 22–25, 125 N.M. 254, 960 P.2d 342. The conduct at issue in *Huff* was the continued questioning of a doctor in a criminal sexual contact case about the doctor's diagnosis of the victim. *Id.* ¶¶ 22–23. The district court repeatedly sustained defense objections, held bench conferences, and warned the prosecutor to limit her questions. *Id.* Because the prosecutor nevertheless persisted with the questioning, even though she modified it based on the court's concerns, the *Huff* Court presumed that the prosecutor was aware of the potential for a mistrial from her conduct. *Id.* ¶ 24. The *Huff* Court held that *Breit's* knowledge test was satisfied by presuming knowledge on the part of a prosecutor who introduced "irrelevant, misleading, and prejudicial testimony. . . ." *Id.* ¶ 21. That Court continued, stating that prohibitions against proffering evidence without an adequate legal and factu-

al foundation was "not a subtle point of law, and one we can presume any prosecuting attorney to know," and that "[a] prosecutor should know the rules of evidence. At the very least, a prosecutor should know a fundamental rule of evidence. . . ." *Id.* ¶¶ 18, 21.

{66} These requirements lead us to conclude that *Huff* is similar to the case at bar. Montoya testified that he was the lead prosecutor in Defendant's trial, that he had extensive murder trial experience, and in his words, "I think I did more murder trials [in one year] than everybody else put together in the state." From that we conclude that Montoya is an experienced attorney who can be reasonably presumed to know the rule of evidence regarding the admission of hearsay. Holding a piece of paper purporting to contain a witness's statement and then failing to call its declarant as a witness has been called "reprehensible." *United States v. Steele,* 91 F.3d 1046, 1051 (7th Cir.1996) (brandishing an unidentified piece of paper during cross-examination to insinuate he had a document other than the one in his hand when he knew his insinuation was untrue was a "reprehensible" tactic although harmless when there was a "plethora" of evidence against defendant); *see also United States v. Beeks,* 224 F.3d 741, 747 (8th Cir.2000) (holding that where the government's case was not strong, the gravity of the single instance of the prosecutor using an act of inappropriate inquiry was not harmless and was proper basis for a new trial).

{67} The ABA standards for prosecution also condemn the practice of attempting to expose factfinders to inadmissible material through cross-examination. "A prosecutor should not knowingly and for the purpose of bringing inadmissible matter to the attention of the judge or jury offer inadmissible evidence, ask legally objectionable questions, or make other impermissible comments or arguments in the presence of the judge or jury." American Bar Association, ABA Standards for Criminal Justice: *Prosecution Function and Defense Function* § 3–5.6(b) (3d ed.1993). This is because "[t]he mere offer of known inadmissible evidence or asking a known improper question may be sufficient to communicate to the trier of fact

the very material the rules of evidence are designed to keep from the fact finder." *Id.* § 3–5.6, cmt. "[The] prosecutor may not use impeachment as a guise for submitting to the jury substantive evidence that is otherwise unavailable." *Silverstein*, 737 F.2d at 868. "[A] prosecutor who asks the accused a question that implies the existence of a prejudicial fact must be prepared to prove that fact." *Id.*

{68} Considering the totality of circumstances, we agree with the initial conclusion of the district court and the Court of Appeals' dissent that Montoya's misconduct was willful. In sum, the State requested that the hearing on the motion to bar further prosecution be reopened to articulate the bases for Montoya's trial conduct. Instead of calling witnesses who could have not only confirmed that the alleged statements existed, but also assisted the district court to understand how Montoya intended to properly gain the admission of the hearsay, at the reopened hearing the State continued to advance its untenable theory that a "good faith" exception existed for the admission of the hearsay. As we did in *McClaugherty I*, we again reject the State's request to find that this hearsay was admissible through Montoya. 2003-NMSC–006, ¶ 35, 133 N.M. 459, 64 P.3d 486. Montoya's misconduct meets the third prong of a *Breit* analysis.

{69} When conducting the *Breit* analysis and evaluating a prosecutor's conduct by looking at the totality of the circumstances, we must be careful that the citizens of New Mexico are not, without exceptionally good reason, "deprive[d] ... of their case" against a defendant, particularly when the prejudice to the defendant can be rectified by a new trial that will be free from the prejudice. *State v. Day*, 94 N.M. 753, 757, 617 P.2d 142, 146 (1980). Equally compelling, of course, is a defendant's constitutional right not to be subjected to double jeopardy. Moreover, unlike the State's interest in a lawful conviction, which could be vindicated upon appeal after a second trial, if the accused is acquitted at a second trial, or, if convicted, has his conviction ultimately reversed on double jeopardy grounds, he has still been forced to endure a trial that the

Double Jeopardy Clause was designed to prohibit. In *Day* we concluded that double jeopardy barred retrial when "the prosecutor engaged in any misconduct for the purpose of precipitating a motion for a mistrial, gaining a better chance for conviction upon retrial, or subjecting the defendant to the harassment and inconvenience of successive trials." 94 N.M. at 757, 617 P.2d at 146. In barring a retrial in *Breit* we relied on Justice Douglas's explanation of the purpose of the double jeopardy clause, and recall his eloquence now:

I read the Double Jeopardy Clause as applying a strict standard. The prohibition is not against being twice punished, but against being twice put in jeopardy. [The double-jeopardy clause] is designed to help equalize the position of government and the individual, to discourage abusive use of the awesome power of society. Once a trial starts jeopardy attaches. The prosecution must stand or fall on its performance at the trial. I do not see how a mistrial directed because the prosecutor has no witnesses is different from a mistrial directed because the prosecutor abuses his office and is guilty of misconduct. In neither is there a breakdown in judicial machinery such as happens when the judge is stricken, or a juror has been discovered to be disqualified to sit, or when it is impossible or impractical to hold a trial at the time and place set.... The policy of the Bill of Rights is to make rare indeed the occasions when the citizen can for the same offense be required to run the gauntlet [sic] twice. The risk of judicial arbitrariness rests where, in my view, the Constitution puts it-on the Government.

*Gori v. United States*, 367 U.S. 364, 372–73, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961) (Douglas, J., dissenting) (quoted authority omitted). Our holding in *Breit* reflected this view. We announced that, to evoke a bar to retrial under our double jeopardy clause, the State's misconduct must manifest a "willful disregard" of the defendant's right to a fair trial. 1996-NMSC–067, ¶ 40, 122 N.M. 655, 930 P.2d 792.

{70} In ordering a new trial in *McClaugherty I*, we found that the timing of the cross-

examination and the paucity of properly admitted evidence led us to the conclusion that "[u]nder the facts of the present case, we cannot conclude that the reference to Defendant's alleged admission was harmless." 2003–NMSC–006, ¶¶ 32–33, 133 N.M. 459, 64 P.3d 486. If Montoya's testimony at the reopened hearing on the motion to bar reprosecution is taken as true, it establishes that he (1) interviewed a crucial witness without her lawyer of record present; (2) did not inform the defense that he had conducted an interview with this witness; (3) never intended to call this witness at trial; and (4) introduced the content of this interview through his cross-examination questions to Defendant. We decline to adopt the State's position that we should defer to the trial court's findings that Montoya's testimony to his additional improprieties formed a "good faith basis" for his questions. We conclude that Montoya's acts at the trial were executed with "willful disregard" of the potential for a mistrial, retrial or reversal and that the third *Breit* prong was met.

## III. CONCLUSION

{71} Section 39–1–1 time limits are not triggered by filing of a motion after a notice of appeal has been filed because the notice places jurisdiction over the matter in the appellate court.

{72} We clarify the holding in *Breit* that the standard by which courts should evaluate a prosecutor's conduct to determine whether the conduct is willful is an objective one in light of the totality of the circumstances of the trial. The prosecutorial misconduct in this case can be described as a single event in front of the jury that, alone and isolated, completely denied this Defendant the due process of law to which he is afforded through our state and federal constitutions. In addition to being prejudicial, our objective review of the evidence reveals that the prosecutor executed these acts with full knowledge of their impropriety and acted with willful disregard of the resulting mistrial, retrial or reversal on appeal. On double-jeopardy grounds we reverse Defendant's convictions, retrial is barred, and we discharge Defendant from any further prosecution in this matter. This case is remanded to the district court for further proceedings consistent with this Opinion.

{73} **IT IS SO ORDERED.**

WE CONCUR: EDWARD L. CHÁVEZ, Chief Justice, and PATRICIO M. SERNA, RICHARD C. BOSSON, Justices, and RICHARD E. RANSOM, J. Pro Tem.